MARTENS and others, Appellants, vs. REILLY and others, imp., Respondents.

*December 14, 1900 — March 19, 1901.*

*Conspiracy: Civil action: Damages: Violation of contract: "Unlawful act."*

1. In a civil action for damages instituted against members of a conspiracy, the gist of the action is the damage; while in a criminal prosecution for the offense of conspiring, the gist of the action is the conspiracy.

2. A conspiracy is defined to be a combination of two or more persons to do a criminal or unlawful act, or to do a lawful act by criminal or unlawful means.

3. If the object to be attained by a conspiracy be criminal or unlawful, the combination offends against the criminal law by common-law rules without any overt act, and by statute when there is such overt act. (Stats. 1898, sec. 4568. But see secs. 4466a and 4466b, pertaining to the statutory conspiracies.) And if the means to be used are criminal or unlawful, the ultimate end to be attained need not be essentially wrong. In either case if damage is produced to the person against whom the conspiracy is directed, an action to recover the same will accrue to him against all the guilty parties.

4. The gist of the civil action against conspirators being the damage, the general rule is that it will not lie against many acting in concert if it will not lie against one of them for the same act. Such rule does not apply to criminal actions.

Martens and others vs. Reilly and others.

5. The violation of a contract is an unlawful act. Therefore, if one or more persons conspire with another to commit, or two or more persons combine together to effect, such violation, and the object of the combination be consummated to the damage of a third person, such third person has his action to recover the damages against him who breached the contract and every person who, by reason of the combination, is connected with the wrong.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Reversed.*

Action for damages. The facts stated in the complaint are substantially as follows: *John A. Martens* and *William Bechstein,* in the fall of 1896, relying on representations made by defendant Mary J. O'Connor and corroborated by her attorney, as to her legal rights, leased of her certain lands in the city of Milwaukee, describing the same, for the term of five years at the yearly rental of $200 and the taxes, paying $100 down upon the lease. The lease was made in writing, and in addition to the essential stipulations it contained the following provisions:

(1) The lessee shall have the first privilege to purchase the premises during the term of the lease, for such price and on such terms as the parties to the lease shall mutually agree to.

(2) In case of a sale of the premises by the lessor she shall have the privilege of canceling the lease on giving written notice of such sale and cancellation, and thereupon the term of the lease shall terminate at the close of the second summer season from the date of such notice, no rent, however, to be paid for the last six months.

(3) The lease shall not be assigned, nor the premises underleased, without written consent of the lessor first obtained.

(4) The leased premises shall be used for the maintenance of a first-class swimming and bathing institution, with the right of furnishing refreshments to its patrons.

(5) The lessees may grade the river bank in preparing the premises for the bathing houses and buildings, but at the end

of the term they shall restore the premises to the condition existing at the time of making the lease.

Soon after the lease was made, the lessees caused the plaintiff *Bechstein-Martens Company* to be incorporated, and then assigned the lease to such company. Consent to the assignment was not obtained of the lessor before making it, but she knew of the contemplated assignment and verbally consented to the same. Prior to February 26, 1897, the leased property was taken possession of by the lessees and improvements were commenced thereon which were under way on that date. Prior to that day, and with knowledge of all the conditions of the lease, one *Bernard O. Reilly*, at the instigation of defendants *Ernst A. Conrad* and *Edward A. Benson*, prevailed upon the lessor and her children to ignore the provisions of the lease giving to the lessees the first chance to purchase the premises, and to give to said *Reilly* or his assigns an option to purchase the same for $8,000. Such option was obtained for the purpose of preventing the establishment of the swimming school, or ending the maintenance of it on the premises as soon as practicable. All of the O'Connors, *Reilly*, and *Benson* co-operated in that scheme. The option, as soon as obtained, and as was previously contemplated by *Reilly*, was assigned to *Conrad* and *Benson*.

About the time the option to purchase was made, plaintiffs *Martens* and *Bechstein* discovered that Mrs. O'Connor had only a dower interest in the property, and that the legal title was in her six children as heirs of her deceased husband, and thereupon they applied to her and her children to obtain a ratification of the lease, and for a written consent to the assignment. By reason of the interference of *Reilly* and his efforts and those of *Benson* and *Conrad* to prevent the use of the property for a swimming school, plaintiffs *Martens* and *Bechstein* experienced considerable difficulty in obtaining a ratification of the lease and a written consent

to its assignment, but such ratification and consent were finally obtained.

In furtherance of the conspiracy to prevent the establishment and maintenance of the swimming school, after the option to purchase was obtained, the holders of such option caused the O'Connors to sign a written cancellation of the lease, which was served upon the plaintiffs, and they were also notified to desist from further improving the property. Their contractors were also notified by the conspirators to stop working upon the property, and to influence them to do so they were told that plaintiffs would not be ready to pay them. When the option to purchase was obtained, *Conrad* and *Benson* did not intend to purchase the property but intended to use the option to deter plaintiffs from establishing the swimming school. The O'Connors were induced by them to violate the terms of the lease and to refuse to protect the lessees in the enjoyment of the benefit of the privilege secured to them by such terms. The result of the conduct of the conspirators was that plaintiffs were obliged to abandon their purpose of constructing and maintaining a swimming school on the leased premises, suffering great loss in doing so.

Defendant Lawrence O'Connor answered separately and apart from the other defendants. Defendants *Patrick F.* and *Phillip O'Connor* joined in an answer, as likewise did *Ernst A. Conrad* and *Edward A. Benson.* The answers were to the effect that the option to purchase was obtained in good faith and not with any intent to injure plaintiffs or either of them; that no conspiracy was entered into or carried out to commit such injury; and that the property was purchased of the O'Connors subject to the lease.

The evidence produced upon the trial proved or tended to prove the following facts: The lease was obtained originally of Mrs. O'Connor, was thereafter ratified by the holders of one half the legal title, was assigned to the plaintiff corpo-

ration, and permission to make such assignment was given in writing as alleged. The assignment was made and the ratification as well, before consent was obtained in writing for the making of the assignment, but Mrs. O'Connor knew of the purpose to make the assignment and verbally consented thereto. The original lessees learned of the state of the title about the time notice to quit was served upon them, and they thereafter obtained the ratification of the lease of the O'Connor heirs and their consent to the assignment. The option was obtained by *Reilly* for *Conrad* and *Benson* with full knowledge of the terms and conditions of the lease. *Reilly* worked upon the sympathy of Mrs. O'Connor, bringing to her attention the objections of himself and others to the use of the property for a swimming school, and his friendship for her deceased husband. In that way and others calculated to stimulate the sympathy of Mrs. O'Connor, he prevailed upon her to give him an option to purchase the property and break her agreement with *Martens* and *Bechstein* and their assignee, the *Bechstein-Martens Company*, to give to the holders of the lease the first right to purchase the property. *Conrad* and *Benson* desired to become the owners of the property for the sole purpose of destroying the swimming-school enterprise as soon as possible.

After plaintiffs knew of the option to purchase, they offered to take the property of the O'Connors on the same terms given to *Reilly*, but the O'Connors were made to believe, by the holders of the option to purchase, that it prevented them from recognizing the rights of the lessees to take the property by purchase, and were induced to co-operate with the efforts to exclude plaintiffs from any interest in the property. The lessees tendered the sum of $400 to the O'Connors and to the holders of the option, which sum was the down payment made by the holders thereof, and demanded the benefit secured to them by their lease as regards the purchase of the property; but the demand was

refused. The holders of the option caused a notice to be made and served terminating the lease, and after they became part owners of the property — which they did by a deed to Nunnemacher, who took the title direct from the O'Connors by the direction of *Conrad* and *Benson*, and a deed of Nunnemacher to *Conrad* and *Benson* and one Wild whom they associated with them — they notified plaintiffs in writing of the state of the title. Plaintiffs' contractors, who were making the improvements upon the property, after the option was obtained, were made to believe by *Conrad* and *Benson* that there was danger of their not getting their pay and that they had no right to place improvements upon the property. They thereupon stopped work, but afterwards commenced again.

Upon plaintiffs' finding that they would be obliged to resort to litigation to establish their rights under the lease, and upon their being unable to obtain any assurance from the holders of the title that they would be allowed to peaceably occupy the property for any considerable length of time, or for any time beyond that allowed to them after the cancellation of the lease, they abandoned the property and leased other lands for the establishment of their swimming school, paying as additional rent $327 per year, and removing their improvements to the new premises so far as such improvements were capable of being removed. They suffered a loss by reason of the facts, in addition to the increased rent, of some over $700. The privilege secured to the lessees in the lease, to take the property by purchase, was a very valuable feature thereof. The improvements on the property, necessary to the establishment of the swimming-school enterprise, were costly, and could not be removed except in part. By reason thereof a long-term lease was necessary in order to enable the lessees to have the use of such improvements for such length of time as to account for their diminution in value to the lessees at the end of the

term. It was also necessary to protect the leasehold estate against disturbance, in the event of the lessor wanting to sell the property and cancel the lease under the right reserved for that purpose, by the preference secured to the lessees to become the purchasers. Without the long term, coupled with the privilege to purchase the leased premises, the prospects of the enterprise were not sufficient to warrant the expenditure of money contemplated by the lease.

At the close of the evidence defendants moved the court for a nonsuit, which motion was granted, and judgment was entered against plaintiffs for costs.

For the appellants there was a brief by *McElroy & Eschweiler*, and oral argument by *F. C. Eschweiler*.

For the respondents *Conrad*, *Benson*, and *Reilly* there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *C. E. Wilde*.

The following opinion was filed January 8, 1901:

MARSHALL, J. It will be seen by the foregoing that the facts upon which this case turned were established without reasonable controversy. If the law applicable thereto is in plaintiffs' favor, clearly, under proper instructions for the guidance of the jury, the case should have been submitted to them to determine how much the defendants ought to pay as compensation for the wrong done. It seems that proper attention was not paid by the learned trial court to the law of the case as laid down by this court on the former appeal. [*Martens v. O'Connor*, 101 Wis. 18.] The opinion seems to, say plainly that on the facts alleged appellants had at least some contract rights against at least some of the O'Connors, and were lawfully in possession of the leased premises; that a violation of those rights was actionable, and that a combination to wilfully effect such violation rendered all the persons liable for the resulting legal damages who were participants in such combination.

True, the law was not stated in just that way, but it is considered that the trained legal mind ought reasonably to have so read it.   Legal opinions are written in contemplation of their being read and applied by persons learned in the law.   It may be that too little attention is paid to the probability of a partisan reading thereof by practitioners, and the effect of such reading upon a trial judge, who is liable, in the press of business under which such judges often labor, to depend to some degree at least upon the ideas of attorneys as to the scope of a decision.   The ideal of judicial perfection in stating a legal proposition will have been reached when one can put ideas into language so plain that no person of common sense, whether he be a layman or a specialist, can fail in reason to understand it.   Probably no one here has the egotism to hope to reach that ideal; yet, expressing my personal view in passing, it is believed that the former statement of the law in this case came reasonably close to it.   True, some mention was made of the fact alleged in the complaint that the option to purchase was fictitious; but it seems that no room was thereby created for believing that such fact was considered of any significance other than as a matter of aggravation of the injury, in that it indicated a specific intent to accomplish the wrong.   True, it was also said, that the cause of action, in the main, "is based upon the claim that defendants conspired to plaintiffs' injury."   That is plainly pregnant with the idea that the gist of the wrong complained of is not the conspiracy, but the damages suffered, and that the conspiracy is important only in that it connects persons with the infliction of such damages so as to render them legally liable therefor, though they may not personally have committed any of the overt acts.   It was distinctly said that the lessees had some rights, and that a combination to wilfully violate those rights rendered all persons connected therewith liable for the injury to the plaintiffs.

We might rest this case upon what has been said. It clearly indicates that the plaintiffs' right to recover was established, that the amount of the recovery was the one question left to be determined, and that such question, under proper instructions, should have been submitted to the jury. However, a brief statement of principles may be of some use in the further proceedings to be had and as a precedent for reference in other litigation.

In a civil action against members of a conspiracy for the recovery of damages, unlike a criminal action, the gist thereof is the damage, not the conspiracy. *Smith v. Nippert,* 76 Wis. 86; *Hutchins v. Hutchins,* 7 Hill, 104; *Bush v. Sprague,* 51 Mich. 41; *Garing v. Fraser,* 76 Me. 37; *East Missouri v. Horseman,* 16 U. C. Q. B. 556; *Kimball v. Harman,* 34 Md. 407; *Leverty v. Vanarsdale,* 65 Pa. St. 507; *McHenry v. Sneer,* 56 Iowa, 649; *Adler v. Fenton,* 24 How. 407; Cooley, Torts (2d ed.), *125. An act legal in itself, in that it does not offend against the criminal law and the injuries are *damnum absque injuria,* regardless of its violation of moral standards, whether such act be the one perpetrated or the means used to that end, generally, if not the subject of a civil action for damages when done by one person, is not if done by many acting in concert. It should be noted that this principle is confined to civil actions, for the very reason that legal damages are essential thereto, while it is otherwise in a criminal prosecution where the gist of the offense is the conspiracy. True, there are cases where it is held that the object of the conspiracy must be actionable in a criminal as well as in a civil case; but the great weight of authority in this country and in England as well is the other way. It is not necessary to discuss here the reason for the distinction. The following are but a few of the many cases that might be cited to support it. *Rex v. Journeymen Taylors,* 8 Mod. 11; *State v. Rowley,* 12 Conn. 101; *State v. Donaldson,* 32 N. J. Law, 151; *Comm. v. Waterman,* 122 Mass. 43; *Morris Run*

Martens and others vs. Reilly and others.

*C. Co. v. Barclay C. Co.* 68 Pa. St. 187; *State v. Buchanan*, 5 Har. & J. 317; *State v. Younger*, 1 Dev. Law, 357; *Savile v. Roberts*, 1 Ld. Raym. 374; *Adler v. Fenton*, 24 How. 407; Lord Bowen in *Mogul S. S. Co. v. McGregor*, 23 Q. B. Div. 616; *Huttley v. Simmons*, [1898] 1 Q. B. Div. 181; 3 Chitty, Cr. Law, 1139. It may be observed in passing that failure to note the distinction indicated, between the facts calling for a civil and those for a criminal remedy, often leads to a confusion of ideas as regards when an action for damages against several wrongfully acting in concert will and when it will not lie, and that there are indications in the books that such confusion has influenced the decisions of courts in some instances to the extent of producing erroneous declarations of law and denials of justice.

The essentials of a conspiracy, whether viewed with regard to its importance in a criminal prosecution or its significance in a civil action for damages, are commonly described in this general language: It is a combination between two or more persons to do a criminal or an unlawful act or a lawful act by criminal or unlawful means. The word "unlawful" is not confined to criminal acts. It includes all wilful, actionable violations of civil rights. In any case the object of the combination is what gives it legal significance. If that object be to do an unlawful act in the sense of committing an actionable wrong, the means contemplated by the combination to effect such object are not material to the cause of action, whether such action be to punish the perpetrators for entering into such a combination or to recover of them the damages inflicted by carrying out its object. If the object of the conspiracy be the use of unlawful means, whether such means be the violation of the civil or criminal law, the unlawfulness of the end sought to be attained is not controlling either in a prosecution for the offense of so conspiring or an action to recover the damages suffered by

the consummation of the wrongful purpose.    6 Am. & Eng.
Ency. of Law (2d ed.), 841.    So the rule of common law is,
as regards indictments for criminal conspiracies, that where
the crime depends on the object of the conspiracy, that ob-
ject must be set forth, but the means need not be; but where
the crime depends upon the character of the means to be
employed, they are material and must be alleged.    *Reg. v.*
*King*, 7 Q. B. 782; *Sydserff v. Reg.* 11 Q. B. 245; *Rex v. Gill*,
2 Barn. & Ald. 204; *People v. Richards*, 1 Mich. 216.    And
the same is true under the new procedure.    *State v. Crowley*,
41 Wis. 271.

In the light of the foregoing elementary principles, the
right of plaintiffs to recover, on the facts established by the
evidence, is too clear for reasonable controversy.    Plaint-
iffs had a lease binding from the first on Mrs. O'Connor at
least, and subsequently on three of her children.    It was
immaterial whether she really had any interest in the
property which she could lease.    So long as she assumed
the right to lease the property she was legally bound to
make her agreement good.    As against her and the three
children, at least, plaintiffs were entitled to the full benefit
of every promise contained in the lease, including the one
giving them the first privilege to purchase the property,
which privilege, as it seems from the evidence, was valuable
to them to protect their possession for a sufficient length of
time to render it reasonably safe to make the large expendi-
ture contemplated by the business which they were about
to enter upon.    If the lessors bound themselves by the lease
beyond their rights in the property, that did not militate
against the right of plaintiffs to hold them liable to carry it
out so far as they could, and for damages for breach of so
much thereof as they could not perform.    The violation of
the contract was an unlawful act rendering them liable to
civil remedies for damages.    They wilfully committed such

violation. They refused to give the lessees the privilege of
protecting their possession of the premises by the purchase
thereof when the conclusion to sell was reached, and that
seriously damaged them. There we have the unlawful act
requisite to hold parties, in combination to perpetrate it,
liable for resulting damages. Defendants *Conrad* and *Benson*
combined with the O'Connors to accomplish that wrong.
They were really the moving parties in the whole matter.
But for their wilful intermeddling in the affair between the
O'Connors and plaintiffs it is not probable that the contract
would have been violated. The unlawful act would have
been actionable if no one had been concerned in it but Mrs.
O'Connor. The others combined with her to do such un-
lawful act. The object of the combination was accom-
plished and there was resulting damage to plaintiffs. So
the case fits the legal test at every point. The damage
stands out significant, independent of the combination.
The combination connects all parties with the damage that
were guilty participants in the wrong.

It is possible that it may have been the view of the learned
trial court that the mere wilful breaching of a contract is
not an unlawful act within the meaning of the law of con-
spiracy. The law on that question is well settled. In a
very recent and somewhat famous case in the United States
supreme court the breaking of a contract was the object of
the combination, and it was held an unlawful act and suffi-
cient to render all the participants therein liable. *Angle v.
C., St. P., M. & O. R. Co.* 151 U. S. 1. This emphatic lan-
guage was there used by Mr. Justice BREWER:

"It has been repeatedly held that, if one maliciously in-
terferes in a contract between two parties, and induces one
of them to break that contract to the injury of the other,
the party injured can maintain an action against the wrong-
doer."

Many leading cases on this branch of the law of conspir-
acy were cited by Mr. Justice BREWER, with quotations from

Martens and others vs. Reilly and others.

opinions in such cases.  The following of such quotations are significant:

" Wherever a man does an act which in law and in fact · is a wrongful act, and such an act as may, as a natural and probable consequence of it, produce injury to another, and which in the particular case does produce such an injury, an action on the case will lie.  .  .  .  If these conditions are . satisfied, the action does not the less lie because the natural and probable consequence of the act complained of is an act done by a third person; or because such act so done by the third person is a breach of duty or contract by him, or an act illegal on his part, or an act otherwise imposing an actionable liability on him."  BRETT, L. J., in *Bowen v. Hall*, 6 Q. B. Div. 333, 337.

" If a person maliciously entices laborers or croppers to break their contracts with their employer and desert his service, the employer may recover damages against such person.   The same reasons cover every case where one person maliciously persuades another to break any contract with a third person.  It is not confined to contracts for service."  RODMAN, J., in *Jones v. Stanly*, 76 N. C. 355, 356, affirming *Haskins v. Royster*, 70 N. C. 601.

See, also, Cooley, Torts (2d ed.), 330; *Lumley v. Gye*, 2 El. .& Bl. 216; *Walker v. Cronin*, 107 Mass. 555.

Enough has been said to enable the trial court to properly end this litigation without its coming here again.  If the case shall be, upon a new trial, presented the same as before, it will be the duty of the trial court to submit to the jury, under proper instructions, the question of damages.  We shall not anticipate that there will be any mistake in that regard by marking out in advance any guiding line.  The principles governing the subject are not of serious difficulty either to state or comprehend.  The trial court will doubtless direct the jury properly in regard to the law to be applied in determining the recoverable damages, without any suggestion from here.

*By the Court.*— The judgment of the superior court is reversed, and the cause remanded for a new trial.

BARDEEN, J., took no part.

The respondents moved for a rehearing.

In support of the motion counsel contended that the decision is grounded on the proposition that the agreement in the lease to give the lessees the first right to purchase was a binding agreement, the violation of which was an unlawful act — a question not decided or considered on the former appeal. That agreement was absolutely nugatory and gave rise to no legal obligation. It was indefinite and incomplete; the minds of the parties never met. *Gill Mfg. Co. v. Hurd*, 18 Fed. Rep. 673; *Wardell v. Williams*, 62 Mich. 50; *Mayer v. McCreery*, 9 N. Y. St. Rep. 114; *Fogg v. Price*, 145 Mass. 513; *Hayes v. O'Brien*, 23 L. R. A. 555. It was void under the statute of frauds. *Harney v. Burhans*, 91 Wis. 351; *Brandeis v. Neustadtl*, 13 Wis. 142, 149; *Seymour v. Cushway*, 100 Wis. 580.

The motion was denied March 19, 1901.