**NATIONAL OIL COMPANY, Inc., a Wisconsin corporation, Plaintiff,**

v.

**PHILLIPS PETROLEUM COMPANY, Inc., a foreign corporation, Defendant.**

**No. C–65–64.**

United States District Court
W. D. Wisconsin.

Nov. 8, 1966.

William P. Skemp, La Crosse, Wis., for plaintiff.

Hubert V. Fuller, La Crosse, Wis., for defendant.

## MEMORANDUM OPINION IN SUPPORT OF ORDER GRANTING DIRECTED VERDICT

JAMES E. DOYLE, District Judge.

Viewed most favorably to the plaintiff, the evidence received at the trial may be summarized as follows:

For about 17 years prior to May 31, 1963, plaintiff National had been a jobber for defendant Phillips. The jobbership was the subject of a year to year contract terminable by either party as of May 31, by giving 90 days notice. Despite this rather insecure contractual base, National was prepared to, and did, make rather substantial investments in land, buildings, tanks, and equipment. The value of these assets as of January 1, 1963, may have been in the order of $195,000.00. 

A significant feature of the jobbership was the function performed by one Stellick and one Howarth. It is disputed whether the role of these men was that of employees of National, or that of independent contractors with National. In my oral opinion of October 20, 1966, I expressed the opinion that it is unnecessary to a decision herein to apply either label to the relationship, because interference with both employment contracts and non-employment contracts may be actionable under certain conditions. In any event Stellick had been associated with National since about 1946, and Howarth since about 1960. Each owned his own truck. National furnished a tank which was installed on the truck. Fuel oil was placed in the truck-tanks at National, and was delivered by Stellick or Howarth to the ultimate consumers. They were paid a commission of a certain sum per gallon for all fuel oil thus sold and delivered. The customers were obtained both by National and by Stellick and Howarth. National kept the books, did the billing, and computed the commissions. Stellick and Howarth were treated as employees for purposes of

social security, workmen's compensation, and medical and hospital group insurance. Their relationship with the ultimate customers was a significant one; they "controlled" a portion of the business; they could take a portion of the business with them if they left National; this "controlled" portion, in the case of Stellick, may have been about 800,000 to 900,000 gallons per year.

There were in existence written customer lists, which were considered to be the property of National. Stellick, however, could have prepared from memory a list of his customers substantially identical to National's list; and this was probably also true of Howarth.

There was no written contract between National, on the one hand, and either Stellick or Howarth, on the other. There was no oral contract by which the relationship was to continue for any fixed period. As of early February, 1963, Stellick and Howarth appeared to be satisfied with their relationship with National.

In about early February, 1963, Phillips elected not to renew the jobbership contract with National for the period commencing June 1, 1963, and so notified National. The reason was Phillips' opinion that National was not realizing the full potential of the market in the La Crosse area. It is undisputed that Phillips was entirely within its rights to make this election and to act on it. In about early February, and perhaps earlier, Phillips decided to try to obtain one Scott Burgess to replace National as its jobber in the La Crosse area. It is also undisputed that Phillips was entirely within its rights to do this. The effort succeeded and Scott Burgess became the Phillips jobber as of June 1, 1963.

Oral notice to National of Phillips' decision was given on a certain day in February, 1963; later the same day, Phillips' representatives saw Burgess about taking over the jobbership; on the evening of the same day, Phillips' representatives called on Stellick and his wife, and encouraged Stellick to agree to associate with Burgess as a route salesman on and after June 1, 1963. The reason for so encouraging Stellick was Phillips' belief that Stellick probably "controlled" a substantial amount of fuel oil business, and that Burgess, and thus Phillips, would benefit from the "gallonage" which Stellick would take with him to Burgess. The local Phillips supervisor was encouraged by his superior to press Stellick to associate with Burgess as of June 1, 1963.

Phillips' decision was a grievous blow to National. National believed, with reason, that only by making promptly a new jobbership arrangement with another supplier could it avoid a major diminution in the value of its physical assets and the total destruction of its intangible asset of good will. National sought out such alternate suppliers. In March or April, National received offers from Deep Rock and from Sinclair ranging from 2½ cents per gallon to 5 cents per gallon for "controlled gallonage" which National could bring to a new jobbership.

National's general manager pressed Stellick to declare whether Stellick intended to stay with National or to go with Burgess or to do something else as of June 1. Stellick declined to commit himself. When National informed Deep Rock and Sinclair that it could not guarantee Stellick's "controlled gallonage," neither company had any further interest in awarding a jobbership to National.

Some time prior to June 1, 1963, National decided to close out its business. Some time prior to the moment at which National arrived at this decision, Stellick had told National's general manager that Stellick would not remain with National on and after June 1 and would go with Burgess instead.

Both Stellick and Howarth actually remained with National through May 31. Thereafter, Howarth went with Burgess. Stellick set up his own jobbership.

Once it had decided to close out its business, National decided to proceed in a manner favorable to Stellick because

of his long service to National. National leased its bulk tank facilities to Stellick; sold him certain equipment and inventory; "gave" him the intangibles, such as the telephone number, the name "National," the customer lists, a "no-compete" contract, and National's good will; and wrote a letter to National's customers commending Stellick to them.

National's claim in this lawsuit is that Phillips committed a tort by interfering with National's relationship with Stellick, without justification. The damages sought represent the difference between the value of certain of the tangible assets of National as a going business, on the one hand, and the amount actually received for these tangible assets by National when it closed out its business, on the other hand; plus the entire value of its intangible assets as a going business, which was allegedly destroyed. With respect to the latter (the so-called "blue-sky" value), certain evidentiary problems arose at the trial. Plaintiff's witness was permitted to testify that the price paid for a jobbership might include a factor of from one cent to two and one-half cents per gallon for "controlled" annual gallonage; also that in the 1963 purchase of a somewhat similar Phillips jobbership in the Duluth area, 20% of the purchase price was considered to apply to intangible assets.

I concluded that in February, 1963, there was an intentional effort on the part of Phillips to persuade Stellick to go with the proposed new Phillips jobber (Burgess) on and after June 1, 1963. I concluded that at the time this intentional effort was made, Phillips knew reasonably well the nature of Stellick's relationship to National, the nature of National's business, and the nature of the effect upon National of Phillips' decision to terminate the jobbership as of May 31.

The central question is: did Phillips commit a tort?

Free of precedent, I would be quick to answer no. The possible tort in question is that of interference with contract. In my view, there was no contract between

National and Stellick to be interfered with; therefore, no tort.

Plaintiff contends, however, that the relationship between National and Stellick was that of a contract terminable at will by either party. Plaintiff further contends that by Wisconsin precedent (I am bound, of course, in this diversity action by the Wisconsin rule, if it can be ascertained), the tort of interference with contract can be committed with respect to a contract terminable at will by either party.

In the course of oral argument on the motion for a directed verdict, plaintiff's counsel was requested to comment on a hypothetical case stated by the court substantially as follows: Assume that an advertisement is placed in the La Crosse newspaper, stating that X company is interested in hiring highly trained engineers, and inviting those interested to send a letter to post office box 100; a highly trained engineer, employed by Y company, reads the advertisement and sends a letter to post office box 100, expressing interest; X company follows up and inquires whether the engineer is under contract with Y company; the engineer responds that there is no written contract, and that there is no oral contract for any period of time, and that he is legally free to change jobs the next minute; X company then offers him a job at higher pay and he accepts forthwith. Plaintiff's counsel contends that under the Wisconsin rule, X company has committed an actionable tort against Y company.

As indicated, I consider such a rule unreasonable, and I entertained marked skepticism that it could be the Wisconsin rule. A review of the Wisconsin cases has persuaded me that plaintiff's counsel's contention is not without basis.

The general rule in employment cases is said to be that enticement may be actionable even though the employment is terminable at will. 30 Am.Jur., "Interference," § 9, p. 67; 57 C.J.S., "Master and Servant," § 625, pp. 428–429. With respect to interference with contractual

rights generally, authority is cited for the proposition that interference with a contract terminable at will is to be governed by the rules applicable to interference with a prospective contract, but opposing authority is cited for the proposition that interference with a contract terminable at will is to be judged by the rules applicable to interference with existing contracts for a fixed term. 86 C.J.S., "Torts," § 44(b), p. 966.

The earliest pertinent Wisconsin decision appears to be Johnson v. Aetna Life Ins. Co., 158 Wis. 56, 147 N.W. 32 (1914). Plaintiff "was a day-laborer [for a manufacturer] who had the right to quit work at any time without breaching his contract of employment. His employer might dispense with his services at any time for or without cause." 158 Wis. at 61, 147 N.W. at 34. In June, 1910, while in the manufacturer's employ, plaintiff suffered an eye injury. He commenced an action against the employer-manufacturer for damages for the injury. Aetna Life Insurance Company appeared in the personal injury action for the employer-manufacturer under an indemnity contract. When he recovered physically from the accident, he returned to work and continued in his employment until March, 1911, when he was discharged. He then brought this action against defendant Aetna, alleging that it had procured his discharge because of his refusal to settle his personal injury claim on Aetna's terms. In this action against Aetna for procuring plaintiff's discharge, the jury made various findings in plaintiff's favor and awarded him both compensatory and punitive damages. On appeal, two questions were raised: (1) whether, on the facts found by the jury, plaintiff was entitled to judgment; and (2) whether there was sufficient evidence to support the jury's finding that the cause of the discharge was the defendant insurer's interference.

The Wisconsin Supreme Court answered the first question affirmatively: " * * * [plaintiff's] right to dispose of his labor wherever he could to best advantage * * * could be interfered with [only] by one acting in the exercise of an equal or superior right." 158 Wis. at 60, 147 N.W. at 33. The court decided that the "jury might well find * * * that the [defendant's] purpose * * * was to deprive the plaintiff of his earning power so that he could not successfully carry on his suit to recover damages for the injuries * * *." This "oppression" is not a "legitimate reason" for the interference "with the relations between employer and employé." 158 Wis. at 60–61, 147 N.W. at 34. The issue of the terminability of the employment at will was not dealt with by the Wisconsin Supreme Court, but it is fair to conclude that this factor was not considered a bar to recovery. (The court answered the second question negatively; found that there was insufficient evidence to support the jury's finding that it was defendant's interference which caused the employer-manufacturer to discharge plaintiff; and directed dismissal of the complaint. Therefore, the language with respect to the first question is dictum.)

In Bitzke v. Folger, 231 Wis. 513, 286 N.W. 36 (1939), the plaintiff Bitzke sued one Mary Folger and Greenfield Laundry Service, Inc.; he alleged that the laundry corporation had failed to perform its obligations under certain agreements made among the parties in settlement of an earlier action, and that the laundry corporation and Mary Folger had conspired to defraud the plaintiff. The defendant laundry corporation brought in a third party, Wittenberger, and cross complained that Wittenberger had interfered maliciously with Mary Folger's performance of the settlement agreements. Wittenberger demurred to the cross-complaint; the demurrer was overruled; Wittenberger appealed. The Supreme Court affirmed.

Wittenberger contended on the appeal, among other things, that the settlement agreements, with which he had allegedly interfered, were themselves unenforceable, in one respect because they were unsigned by one of the parties and thus "void under the statute of frauds," and

in another respect because they contemplated arbitration in a situation in which a statute would not permit it. 231 Wis. at 522, 286 N.W. at 40. The Wisconsin Supreme Court rejected this contention:

"Even though some part of the agreements may have been legally unenforceable, nevertheless, the malicious procurement of the termination thereof by an intermeddler, while the parties thereto were ready and willing to continue performance, would render him liable for damages caused thereby. Martens v. Reilly, 109 Wis. 464, 474, 84 N.W. 840.

"There is applicable by reason of the analogous circumstances the statement in 15 R.C.L. p. 86, § 48, that:

'According to the weight of authority, neither the fact that the term of service interrupted is not for a fixed period, nor the fact that there is not a right of action against the person who is induced or influenced to terminate the service or to refuse to perform his agreement is of itself a bar to an action against a third person maliciously and wantonly procuring the termination of employment or a refusal to perform an agreement therefor. It is the legal right of a party to such an agreement to terminate it or to refuse to perform it, and in doing so he violates no right of the other party to it; but so long as the former is willing and ready to perform, it is not the legal right, but is a wrong on the part of a third person maliciously and wantonly to procure the former to terminate or refuse to perform it.'" 231 Wis. 513, 522–523, 286 N.W. 36, 40–41.

(Martens v. Reilly, 109 Wis. 464, 474, 84 N.W. 840 (1901), cited in the passage from Bitzke v. Folger, *supra*, is not in point. It involved an alleged conspiracy to cause certain lessors to violate the terms of a lease, including an option to purchase granted to the lessee; it was contended that the lessors' combined interest in the real estate was less than full title and that they would have been unable to convey full title had the lessee exercised the option; the court held this factor immaterial since the lessors could be held for damages if they failed to perform. Thus, *Martens* involved neither a contract terminable at will, nor a void contract, nor an unenforceable contract.)

In Mendelson v. Blatz Brewing Co., 9 Wis.2d 487, 101 N.W.2d 805 (1960), insofar as the complaint affected defendants Grimm and Harrison, it alleged: that plaintiff Mendelson was a minority stockholder in, and secretary-treasurer and general manager of, a beer distributing corporation; that defendants Grimm and Harrison conspired to cause the removal of Mendelson as general manager and to coerce him into selling his stock in the corporation for less than its fair market value; that Mendelson was so removed and Grimm's inexperienced son succeeded him as general manager; that Grimm and Harrison then squeezed Mendelson into selling his minority stock at far less than its fair market value; that Grimm and Harrison "had no legal cause whatsoever for the discharge of the plaintiff * * * except the reason and desire * * * to acquire the valuable business for themselves at plaintiff's loss and to furnish a place of employment for the defendant Grimm's son." 9 Wis. 2d at 488–489, 101 N.W.2d at 806. The trial court sustained demurrers to the complaint on the ground that it failed to state a cause of action. On appeal, the Supreme Court of Wisconsin reversed, directing that the demurrers be overruled. It stated (9 Wis.2d at 490–491, 101 N.W.2d at 807):

"The plaintiff's employment by the corporation at a salary of $9,000 per year established a contractual relationship between them. The complaint fails to allege that such employment was for any fixed period, and, therefore, it must be assumed for purposes of the demurrer that it was terminable at will by either party. However, the weight of authority is to the effect that a cause of action is maintainable

for a wrongful interference by a third party with an employment relationship terminable at will. Annotations entitled 'Liability for procuring breach of contract,' 84 A.L.R. 43, 60, and 26 A.L.R.2d 1227, 1258. Prosser, Torts (2d ed.), p. 726, sec. 106, states the law on this point as follows:

'However, eminent legal writers to the contrary notwithstanding, the overwhelming majority of the cases have held that interference with employments or other contracts terminable at will is actionable, since until it is terminated the contract is a subsisting relation, of value to the plaintiff, and presumably to continue in effect. The possibility of termination does, however, bear upon the issue of the damages sustained, and it must be taken into account in determining the defendant's privilege to interfere.'

"Wisconsin has aligned itself with the majority in holding that a cause of action is maintainable for unlawful interference with an employment contract terminable at will. Johnson v. Aetna Life Ins. Co., 1914, 158 Wis. 56, 147 N.W. 32."

The three decisions discussed above are the only decisions of the Wisconsin Supreme Court cited to us which deal either with interference with contracts terminable at will (Johnson v. Aetna Life Ins. Co. (1914), and Mendelson v. Blatz Brewing Co. (1960)), or with unenforceable contracts (Bitzke v. Folger (1939)).

The apparent rationale common to all three situations is that contained in the statement by Prosser and quoted approvingly in Mendelson v. Blatz Brewing Co., *supra*, 9 Wis.2d at 491, 101 N.W.2d at 807: "the contract [terminable at will] is a subsisting relation, of value to the plaintiff, *and presumably to continue in effect* [emphasis ours]." Thus, in Johnson v. Aetna Life Ins. Co., although the employer-manufacturer was under no legal obligation to persist in its relationship with the plaintiff-employee, it could be presumed (in the absence of evidence to the contrary) that the employer-manufacturer would persist in the relationship, that the employment relationship would be stable; unjustified interference by the defendant insurance company with this presumed persistence on the part of the employer-manufacturer, with this presumed stability in the relationship of the employer-manufacturer with the plaintiff-employee, was considered actionable. So, in Bitzke v. Folger, although, by virtue of the Statute of Frauds, a portion of the settlement contract may have been unenforceable against a non-signatory, it could be presumed that the non-signatory would abide by it. So, in Mendelson v. Blatz Brewing Co., although the employer-beer distributing corporation was under no legal obligation to persist in its relationship with the plaintiff-employee, it could be presumed (from the pleadings and in the absence of evidence to the contrary) that the employer-beer distributing corporation would persist in the relationship, that the relationship would be stable; unjustified interference by the defendant stockholders with this presumed persistence on the part of the employer-beer distributing corporation, with this presumed stability in the relationship of the employer-beer distributor with the plaintiff-employee, was considered actionable.

In the present case, plaintiff's evidence, even when viewed in the light most favorable to it, does not permit the presumption that, at the time of defendant Phillips' "interference," Stellick, who was clearly under no legal obligation to do so, would persist in his relationship with National on and after June 1, 1963, and that the relationship would be stable on and after that date.

Phillips' lawful decision, communicated in early February, to drop National as its jobber on June 1 revolutionized National's business situation, and, therefore, revolutionized Stellick's relationship to National. For some 17 years National Oil Company and the Phillips jobbership had been one and the same. As of June 1, the Phillips jobbership was to be re-

moved from the equation. Under these circumstances, Stellick had several alternatives to consider: he might decide to go with the new jobber whom Phillips might obtain; he might decide to seek an arrangement with a jobber for another oil supplier as a route salesman; he might decide to seek a jobbership of his own; he might decide to refrain from a decision until it could be determined whether National could obtain a jobbership with another oil supplier; he might choose an entirely new career. His range of alternatives was broadened by the "control" he was believed to exercise over a certain portion of his gallonage as a route salesman with National and Phillips.

The essence of plaintiff's claim is that but for Phillips' encouragement of Stellick in February to go with Burgess in June, Stellick would have remained constant to National from February to June and beyond. To support this proposition, plaintiff offered neither testimony by Stellick nor any other evidence. To support it, plaintiff relied wholly upon a presumption: that the *status quo* is presumed to continue. But, as we have seen, the plaintiff's evidence revealed that the *status quo*, as it affected National and Stellick, had been shattered by Phillips' February decision to transfer the jobbership. Absent the presumption of stability, the relationship between National and Stellick, did not enjoy the law's protective cloak against interference.

There is a further consideration: Despite the disruption of the basis for the relationship between National and Stellick which sprang immediately from Phillips' announcement one February day, arguably it might be presumed that Stellick would continue with National the following day or week or month, or possibly it might be presumed that the relationship would continue until the Phillips jobbership ended on May 31. But it is not alleged or proved that Phillips encouraged Stellick to leave National prior to June 1, and the evidence is that he did not leave National until the close of business on May 31. Thus even if the relationship between Stellick and National, though actually terminable by either party on a moment's notice, is viewed as a relationship with a reasonable expectancy of 90–120 days duration, Phillips did not attempt to induce its breach and it was not breached.

The preceding discussion has been directed entirely to the question whether the relationship between National and Stellick, following Phillips' February decision to transfer the jobbership on June 1, was the kind of relationship which enjoys legal protection against interference. In holding orally on October 20 that the relationship did not enjoy such protection, I remarked, and now repeat, that I was fortified by two other considerations: (1) that there was no evidence whatever of actual malice on the part of defendant Phillips; and (2) that it appears any damage award might well be fatally speculative.

It is true that Wisconsin is among the states which have cited and followed a rule stated in Campbell v. Gates, 236 N.Y. 457, 141 N.E. 914 (1923), that "the act of a person, who procures another to breach a contract, is malicious if the actor acts intentionally and knowingly for 'unworthy or selfish purposes.'" Mendelson v. Blatz Brewing Co., 9 Wis.2d 487, 493, 101 N.W.2d 805, 808 (1960); Sweeney v. Stenjem, 271 Wis. 497, 501–502, 74 N.W.2d 174 (1956); E. L. Husting Co. v. Coca Cola Co., 205 Wis. 356, 365–366, 237 N.W. 85, 238 N.W. 626, 84 A.L.R. 22 (1931). In *Husting*, it was said that "the definition of 'malice' has been broadened to include unjustified interference with the contractual relationship" (205 Wis. at 365, 237 N.W. at 89). In *Mendelson*, the court quoted (9 Wis.2d at 494, 101 N.W.2d at 808) approvingly this language from Carpenter, "Interference with Contract Relations," 41 Harv.L.Rev. 728, 734 (1928):

"The courts which uphold liability for interference with contract do not use the word malice in the sense of malevolence, spite, or ill will. They probably use it to mean merely intentionally

inducing a breach of contract without justification."

The presence or absence of malice, therefore, appears to turn upon whether the interference was "justified" or whether its purposes were "unworthy or selfish." It is helpful to consider this factor with respect to each of the three Wisconsin decisions discussed in detail earlier in connection with the protectability of contracts terminable at will. In Johnson v. Aetna Life Ins. Co., 158 Wis. 56, 60–61, 147 N.W. 32, 34 (1914), based on the evidence of record, the "jury might well find * * * that the [defendant's] purpose * * * was to deprive the plaintiff of his earning power so that he could not successfully carry on his suit to recover damages for the injuries * * *." This "oppression" was not a "legitimate reason" for defendant's interference. In Bitzke v. Folger, 231 Wis. 513, 516, 286 N.W. 36, 38 (1939), the cross complaint, which was upheld against demurrer, is said to have alleged that the acts of Wittenberger "were calculated to cause loss and damage to the Laundry Company in its lawful business, and * * * were done with the unlawful purpose of causing such loss and damage, without any right or justifiable cause on his part * * *." In Mendelson v. Blatz Brewing Co., 9 Wis.2d 487, 492–493, 101 N.W.2d 805, 808 (1960), in upholding the complaint against demurrer, the court commented:

> "Prosser, Torts (2d ed.), p. 738, sec. 106, points out that a defendant, who otherwise would stand in a position of privilege in causing a termination of contract, enjoys no privilege if his object is to put pressure upon the plaintiff and coerce him into complying with the defendant's wishes in some collateral matter. In the instant complaint it is alleged that the respondents brought about the plaintiff's discharge in order to further their improper scheme of acquiring his stock in the corporation for less than its worth. The other motive alleged is that the discharge was sought in order to give the managership to the inexperienced

son of the respondent Grimm. Neither of such motives lay within the privilege possessed by the respondents as majority stockholders to take whatever action they deemed advisable to further the interests of the corporation."

Thus, on each of the three occasions on which the Wisconsin court declared that protection against interference is to be accorded contracts terminable at will or unenforceable contracts, the interference itself was considered to have been without justification. This raises the question whether justification for interference with a contract terminable at will may be found in circumstances which would not constitute justification for interference with a contract for a fixed term.

Section 766 of the Restatement, Torts, provides:

> "Except as stated in Section 698 [not here relevant], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
>
>> (a) perform a contract with another, or
>>
>> (b) enter into or continue a business relation with another
>
> is liable to the other for the harm caused thereby."

Comment (c) to Section 766 states, in part:

> "Clause (b) relates to [a situation] * * * in which B and C are already in a business relationship which is terminable at B's will and A induces or otherwise purposely causes B to terminate the relationship, as, for example, to terminate an employment or tenancy at will, or to call a demand note. Clause (a) relates to cases in which the conduct induced or otherwise purposely caused by A constitutes a breach of B's existing contract with C. Separation of the situations described in Clauses (a) and (b) is not necessary for the rule stated in this Section; but the separation is necessary in determining the existence or non-existence of privilege in certain

circumstances. The privileges to induce breach of contract are fewer than those to induce the conduct stated in Clause (b) (see § 768). In the latter case the person induced is subject to a legal duty which the actor causes him to violate, while in the former case there is no duty. Moreover, in the latter case, the person harmed has paid consideration for the expectancy with which the actor interferes. An interest which is a sufficient basis for a privilege to induce a person not to enter into a business relation with another may, therefore, be insufficient to create a privilege to induce a breach of contract."

Section 767 of the Restatement, Torts, provides:

"In determining whether there is a privilege to act in the manner stated in § 766, the following are important factors:

(a) the nature of the actor's conduct,

(b) the nature of the expectancy with which his conduct interferes,

(c) the relations between the parties,

(d) the interest sought to be advanced by the actor and

(e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand."

Comment (c) to Section 767 states, in part:

"Some commercial expectancies receive greater protection than others. A, who is privileged to persuade B not to make a certain contract with C, may not be privileged to persuade B to commit a breach once the contract has been made (see, for example, § 768). The result in the latter case is due in part to the greater definiteness of C's expectancy and his stronger claim to security for it and in part to the lesser social utility of A's conduct."

Section 768 of the Restatement, Torts, provides:

"(1) One is privileged purposely to cause a third person not to enter into or *continue* [emphasis added] a business relation with a competitor of the actor if

(a) the relation concerns a matter involved in the competition between the actor and the competitor, and

(b) the actor does not employ improper means, and

(c) the actor does not intend thereby to create or continue an illegal restraint of competition, and

(d) the actor's purpose is at least in part to advance his interest in his competition with the other.

(2) The fact that one is a competitor of another for the business of a third person does not create a privilege to cause the third person to commit a breach of contract with the other even under the conditions stated in Subsection (1)."

Comment (i) to Section 768 states:

"The privilege of a competitor stated in Subsection (1) does not include inducement of breach of contract. When B is legally free to deal either with C or with A, the privilege of competition implies a privilege on the part of A to induce B to deal with him rather than with C. But when B is legally obligated to deal with C, A is not privileged, by the mere fact of competition, to induce B to commit a breach of his legal duty. * * *."

With respect to the factors set forth in Section 767 of the Restatement for determining whether the interference was privileged:

(a) The nature of Phillips' conduct was unmarked by fraud, coercion, or deceit. It was a straightforward effort to persuade Stellick to associate with the new jobber as of June 1.

(b) The nature of National's expectancy with which Phillips' conduct interfered was, as we have said, highly indefinite. Stellick was not bound "to continue a business relation" (Section 766(b)) with Na-

tional, and events had rendered it quite uncertain whether he would do so.

((c) The relations between Phillips and Stellick were not of the sort which might themselves support a privilege; such as that of a business adviser to a client.)

(d) The interest sought to be advanced by Phillips was a straightforward economic interest, namely, the success of its new jobber; no indirect or collateral purpose motivated Phillips; no independent motive to cripple National motivated Phillips.

(e) The proper balance of social interests between protecting National's expectancy on the one hand and protecting Phillips' freedom of action on the other hand is, of course, debatable, but the social interest in relatively free competition seems to me the greater.

■ This social interest in relatively free competition is highlighted by Section 768. The present case falls under subsection (1) of Section 768, rather than subsection (2); that is, Phillips at most caused Stellick not to "continue a business relation" with National, and did not cause Stellick "to commit a breach of contract" with National. Applying the factors set forth in Section 768(1), it appears that:

(a) The relation between Stellick and National concerned a matter involved in the potential competition between Phillips' new jobber and National.

(b) Phillips employed no improper means.

(c) There is no suggestion that Phillips intended thereby to create or continue an illegal restraint of competition.

(d) Phillips' purpose was to advance its interest in its potential competition with National and with other major oil companies and their jobbers in the La Crosse area.

This distinction emphasized by the Restatement between the necessary conditions to the privilege to interfere with a contract for a fixed term, on the one hand, and less stringent conditions to the privilege to interfere with a contract terminable at will, on the other, is also recognized by Prosser:

"The possibility of termination does, however, bear upon the issue of the damages sustained, and it must be taken into account in determining the defendant's privilege to interfere. So much more is allowed in the way of interference to further the defendant's own legitimate interests where the contract is subject to such termination, that contracts terminable at will might very well be placed in an intermediate classification of their own, half way between contracts for a definite term and the mere expectancy of prospective advantage. The courts, however, do not appear to have recognized them as a separate group; and to avoid too much repetition, it seems desirable to consider them with other contracts, with the recognition that they receive much more limited protection." Prosser, Law of Torts, (3d ed., 1964).

■ From the foregoing I conclude that even if the February, 1963, relationship between National and Stellick, projected forward to June 1 and beyond, was a relationship which enjoyed protection against interference, Phillips was nevertheless privileged to interfere with the relationship in the manner which it chose.

Finally, had this case gone to the jury, any damage award might well be fatally speculative. For the reasons set forth in the first portion of this opinion, on the basis of the evidence actually presented at the trial, the jury was left entirely to speculation:

whether, but for Phillips' interference in February, Stellick would have chosen to remain with National on and after June 1;

whether, but for Phillips' interference in February, Stellick would have assured National in March and April

that he intended to remain with National on and after June 1; or

whether, had Stellick given National such assurance in March and April, either Deep Rock or Sinclair would have been persuaded that National's "controlled gallonage" was sufficient to justify completing a jobbership arrangement with National.

Accordingly, for the reasons set forth in this opinion, the defendant's motion for a directed verdict, made at the close of the evidence offered by the plaintiff, has been granted.