CRANSTON and another, Appellants, v. BLUHM and another, Respondents.

*November 28, 1966—January 3, 1967.*

194

For the appellants there was a brief and oral argument by *David D. Brown* of Green Bay.

For the respondents there was a brief by *Peickert, Anderson, Fisher, Shannon & O'Brien* of Stevens Point, for Prudential Theatres Company of Wisconsin, Inc., and by *Weber & Bolte* of Wausau, for Frank Bluhm, and

oral argument by *John E. Shannon, Jr.*, and *Richard J. Weber.*

CURRIE, C. J.   This court has defined a conspiracy as "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." [1]

The gist of the alleged conspiracy is that Bluhm and Prudential conspired to close the Lyric Theatre and thus eliminate the only theatre in Stevens Point which competed for patronage with Prudential's Fox Theatre.  The purpose of the alleged conspiracy is not in itself unlawful so the test of whether the instant complaint states a good cause of action is dependent on whether it alleges any unlawful acts on the part of the defendants which were performed pursuant to the conspiracy.  The word "unlawful" as thus used need not be a criminal act since any wilful, actionable violation of a civil right is sufficient. [2]  For example, a conspiracy to cause a breach of contract is actionable. [3]

Plaintiffs contend that the complaint alleges three unlawful acts which were performed pursuant to the conspiracy:

(1)  The closing of the Lyric Theatre for a period in excess of six months in a lease year.

(2)  The execution of the "Lyric Theatre Operating Agreement" between Bluhm and Orpheum, which was subsequently assigned by Orpheum to Prudential.

---

[1] *Mendelson v. Blatz Brewing Co.* (1960), 9 Wis. (2d) 487, 490, 101 N. W. (2d) 805. Substantially the same definition is set forth in *Wachowski v. Lutz* (1924), 184 Wis. 584, 593, 201 N. W. 234; *White v. White* (1907), 132 Wis. 121, 129, 130, 111 N. W. 1116; and *Martens v. Reilly* (1901), 109 Wis. 464, 473, 84 N. W. 840.  See also 16 Am. Jur. (2d), Conspiracy, p. 149, sec. 43.

[2] *Martens v. Reilly, supra,* footnote 1, page 473.

[3] *Mendelson v. Blatz Brewing Co., supra,* footnote 1, page 490, and cases there cited.

(3) The retaking of possession of the Lyric Theatre after plaintiffs had given notice of termination of the lease and had leased the theatre and delivered possession thereof to a new tenant.

It is not necessary that plaintiffs succeed in establishing that all three of the above acts were unlawful. The unlawfulness of any render the complaint good against demurrer.

### Closing of Theatre for a Period in Excess of Six Months.

Plaintiffs concede that the lease entered into between Bluhm and themselves contains no express prohibition against closing the Lyric Theatre for more than six months but contend that such a prohibition exists by implication. The trial court held that such a prohibition is not to be implied. We agree.

The only language in the lease which refers to closing of the theatre for more than six months in any lease year is found in the default clause. We do not, however, deem the wording of that clause to prohibit a closing of the theatre for more than six months in any lease year. The first sentence of the default clause reads:

"Lessee agrees that if default shall at any time be made by him in the payment of the rental to be paid hereunder when due, or if default shall be made in any of the other terms, conditions, or covenants to be by Lessee kept, observed, and performed, and such default, or defaults, shall continue for a period of Thirty (30) Days after written notice thereof shall have been given by Lessors to Lessee, or if Lessee fails to operate the theatre (keep the theatre open for business) for a period of Six (6) Months in any lease year, then Lessors may, at their option, at any time thereafter and prior to the curing of such default, declare the term of this lease ended and terminated by giving Lessee written notice of such termination."

It seems abundantly clear from this wording that, while plaintiffs were afforded the right to terminate the lease in the event the theatre was not operated for at least six months in any lease year, such closing was not a breach of any affirmative covenant of the lease.

Inasmuch as there is no affirmative requirement in the lease that the theatre be operated at least six months in any lease year, the closing of the theatre by the defendants for the period beginning about May 1, 1962, was not an unlawful act upon which plaintiffs can predicate their action for damages grounded on conspiracy.

### Execution of the Operating Agreement.

If execution of the operating agreement of November 2, 1961, between Bluhm and Orpheum constituted an assignment or sublease, it would be unlawful because of the express prohibition contained in the lease against assignment or subleasing without plaintiffs' consent.

The essential provisions of the operating agreement were: The duration of the agreement was for the entire remainder of the lease term. Orpheum was given the exclusive right to operate the theatre, to procure and book motion picture films and attractions to be exhibited, and determine theatre policy. Orpheum was to hire, supervise, fix the compensation of, and discharge all employees. Bluhm was to be reimbursed by Orpheum for the expenses he had incurred in renovating the theatre and was to receive $3,500 per year fixed rental, except that the rental for the first lease year was to be $3,416.66. Reimbursement and payments of rent were to be made out of the gross receipts. In addition Bluhm was to receive 10 percent of the operating profits. The remaining 90 percent were to be retained by Orpheum. Title to any personal property, fixtures, improvements and equipment was to vest in Bluhm upon termination of the agreement. The only control retained by Bluhm was that no ex-

penditures in excess of $200 for improvements, alterations or additions were to be made by Orpheum unless first approved by him in writing.

Thompson on Real Property distinguishes assignments and subleases as follows:

"An assignment of a lease may be said to be a transaction by which the lessee transfers his entire interest in the demised premises or a part thereof for the unexpired term of the original lease. So the basic distinction between an assignment and a sublease is that by the former the lessee conveys his whole interest in the unexpired term leaving no reversion in himself, while the latter transfers a part only of the leased premises for a period less than the original term." [4]

Because the operating agreement was to extend for the entire balance of the lease term and the entire premises were included, it was not a sublease. It does, however, have all the characteristics of an assignment. To quote from Thompson further:

"Any language which shows the intention of the parties to transfer the property from one to the other is sufficient, the form of *the instrument being immaterial.* If it has the legal effect to pass to another the lessee's interest in the whole or in any part of the demised premises for his entire term, or the remainder of his term, it is an assignment." (Emphasis supplied.) [5]

We deem the provision which required Orpheum to obtain Bluhm's written consent to an expenditure in excess of $200 for improvements, alterations or additions insufficient to prevent the operating agreement from constituting an assignment of the lease within the meaning of the provision of the lease which prohibited an assign-

[4] 3A Thompson, Real Property, pp. 50–52, sec. 1210. See also 1 American Law of Property, pp. 297, 298, sec. 3.57; 32 Am. Jur., Landlord and Tenant, p. 290, sec. 314; 2 Cases on Property (Walsh and Niles, 2d ed.), p. 470; Wallace, Assignment and Sublease, 8 Indiana Law Review (1933), 359.

[5] 3A Thompson, Real Property, p. 53, sec. 1210.

ment without plaintiffs' consent. Neither do we think it material how Orpheum was to remunerate Bluhm for what Orpheum obtained from him under the agreement.

Defendants rely principally on *Waterville v. Kelleher* [6] where an agreement to operate an opera house was held to be neither an assignment nor a sublease, but merely an agreement which conferred a privilege or license to operate the opera house. However, in that case the lessee (corresponding to Bluhm) retained greater incidents of control, *i.e.,* he retained the right to let the opera house to local parties and the right to terminate the contract on thirty days' notice.

We conclude that the execution of the operating agreement was a breach of the lease which, as we have stated, prohibited an assignment without plaintiffs' consent. The assignment was therefore an unlawful act.

While Orpheum is not a defendant in this action the complaint alleges that it was under the control of Prudential and that the execution of the operating agreement was part of a continuing conspiracy in which those under Prudential's control, meaning Orpheum, united. According these allegations the liberal construction we must when attacked by demurrer, we hold that they are sufficient to charge that Orpheum entered into the operating agreement with Bluhm while under Prudential's control as part of the conspiracy. When so construed the complaint states a cause of action for damages sustained as a result of conspiracy.

### The Retaking of Possession of Theatre by Defendants.

Defendants do not dispute the fact that on the basis of the allegations of the complaint they were guilty of an unlawful act in retaking possession of the Lyric Theatre after plaintiffs had entered and delivered possession to

[6] (1928), 127 Me. 32, 141 Atl. 70.

their new tenant, Elmer Krueger. Rather they contend that an action to recover damages based on such conduct is in reality an action for trespass, and that plaintiffs cannot maintain such an action where their tenant was in possession and it was the tenant, not plaintiffs, who was dispossessed.

Defendants are correct in their contention that a landlord cannot maintain an action for trespass against one who dispossesses his tenant.[7] However, we deem this to be entirely beside the point insofar as the posture of the instant complaint is concerned. The complaint makes it clear that the damages sought to be recovered are for the closing of the Lyric Theatre pursuant to the conspiracy to benefit the operation of Prudential's Fox Theatre, and that defendants' wrongful repossession of the Lyric Theatre prolonged such closing. It is the damages which are the gist of a cause of action grounded on conspiracy.[8]

Thus defendants' unlawful acts of dispossessing the tenant Krueger and thereafter keeping the Lyric Theatre closed provide an additional basis for holding that the complaint states a cause of action.

*By the Court.*—Order reversed, and cause remanded for further proceedings consistent with this opinion.

---

[7] *Gunsolus v. Lormer* (1882), 54 Wis. 630, 634, 12 N. W. 62; Prosser, Torts (3d ed.), p. 69, sec. 13; 52 Am. Jur., Trespass, p. 854, sec. 25.

[8] *Singer v. Singer* (1944), 245 Wis. 191, 195, 14 N. W. (2d) 43.