**RESTAURANT ASSOCIATES INDUS-TRIES, INC., Plaintiff,**

**v.**

**ANHEUSER–BUSCH, INC., Defendant.**

**No. 75 Civ. 3018 (MP).**

United States District Court, S. D. New York.

July 9, 1975.

Dornbush, Mensch, Mandelstam & Schwartz, New York City by Martin Mensch, and Robert J. Schaeffer, New York City, for plaintiff.

Wilkie, Farr & Gallagher, New York City by Helmer R. Johnson, and Robert J. Kheel, New York City, for defendant.

OPINION

POLLACK, District Judge.

DECISION OF THE COURT

THE COURT: The plaintiff sues to enjoin the attempted termination as of June 30, 1975 by defendant of an allegedly subsisting contract to operate and manage the food and beverage facilities of the Old Swiss House located in Busch Gardens, Tampa, Florida owned by the defendant and claimed to be a unique tourist attraction. The restraint sought is for the duration of such agreement and from carrying out an agreement which defendant entered into with plaintiff's general manager for replacing plaintiff in the operation and management of the restaurant. Substantial damages as well as declaratory relief are claimed.

Jurisdiction herein rests on diversity and the requisite amount in controversy.

This suit was commenced on June 20, 1975, and on application for a preliminary injunction a temporary restraining order was granted and a hearing was set by consent for July 8, 1975. The parties have presented their proofs at the evidentiary hearing held.

Plaintiff Restaurant Associates Industries, Inc. (Associates hereafter), is and was at all relevant times a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in the City, County and State of New York.

Defendant Anheuser-Busch, Inc. (Busch hereafter), is and was at all relevant times a corporation organized and existing under the laws of the State of Missouri, having its principal place of business in St. Louis, Missouri and is licensed to do business in the State of New York.

Busch is and was at all relevant times the owner of certain premises known as Busch Gardens located in Tampa, Florida. Busch Gardens is a unique tourist facility on more than 250 acres of landscaped grounds containing gardens, lagoons and arbors. Busch Gardens contains and includes numerous tourist exhibits such as Wild Animal Kingdom, an aviary, family oriented amusement and entertainment facilities, boutiques and gift shops and related facilities.

Included among the facilities at Busch Gardens are food and beverage service areas consisting of a firstclass restaurant known as The Old Swiss House, hereinafter referred to as Swiss House, and a number of snack bars, juice bars, fruit stands and food carts. Swiss House is an enlarged replica of a restaurant of the same name in Lucerne, Switzerland built in the early 18th century and owned by relatives of the wife of August Busch, Jr., a past president of Busch.

In order to view the issues on this application in proper focus it is necessary to understand the background of events from which this controversy arises. There are the following:

Busch was dissatisfied with the operation by an independent food service company of the food and beverage facilities located in Busch Gardens. In 1969 Busch requested Associates, a public company whose principal business is managing restaurant and beverage service areas and offering consultation services with respect thereto, to assume, under the direction and control of Busch, responsibility for the operation of both Swiss House and the so-called fast food facilities consisting of snack bars, food stands and food carts, all located in Busch Gardens.

On or about October 22, 1969 Associates and Busch entered into an agreement providing for the management by

Associates on behalf of Busch of all of the restaurant, snack bar, food and beverage facilities, including Swiss House at Busch Gardens. The term of that agreement was two years commencing as of December 4, 1969, which term was extended by agreement of the parties until December 25, 1971.

Prior to the expiration of the October 22, 1969 agreement the parties apparently agreed to the extension referred to and to structure a new agreement to take effect on December 26, 1971, which they did. The new agreement made was for a term of two years commencing as of December 26, 1971 and contained an automatic renewal clause for one year periods beginning with the end of the first two-year period. The renewals were to be on the same terms and conditions and to take effect annually unless as stated in paragraph 4(b) thereof, either party gives written notice to the other not less than 90 days prior to the expiration of the initial term or additional term that the agreement shall terminate at the end of the term. This agreement was dated December 8, 1972 but actually was not signed until many months thereafter and made effective as stated, as of a year prior to its date, that is, as of December 26, 1971 and for two years thereafter. This was the last written agreement made by the parties, although, as we shall see, negotiations to reach a revised agreement were undertaken spasmodically without resulting in a meeting of the minds.

During the early part of 1973 attempts to agree on the desired revisions were made. Finally on September 24, 1973, 91 days before the expiration of the December 26, 1972 contract, the defendant notified the plaintiff that it was giving notice "in compliance with the requirements of Paragraph 4(b) of the management agreement," (the cancellation clause) that the defendant decided to renegotiate terms of the management arrangement "which is scheduled to terminate December 25, 1973."

This notice was sent within the time limit required therefor and was duly received without objection by the plaintiff as to the timeliness or force of the notice given.

It took until January 28, 1974, the following year, for the formulation and submission by defendant to plaintiff of a rough draft of the new terms proposed for a management agreement. This draft was submitted by the defendant. Meanwhile the parties were operating without any agreement binding them and obviously, therefore, were on an at will basis.

The defendant's January 28, 1974 draft of agreement, in its Preamble, stated *inter alia:*

"Busch gave Associates timely notice of its intent to terminate the agreement on December 25, 1973 if it could not renegotiate certain terms of the agreement. To this end Busch and Associates have renegotiated certain terms as requested by Busch, as well as certain terms as requested by Associates."

Thereafter, representatives of the parties met in Florida and, in particular, at a meeting toward the end of July 1974 they discussed the relationships of the parties. An understanding was reached then, or perhaps at an earlier time, that the fast food management would be turned over on November 4, 1974 to the defendant and meanwhile the plaintiff would pay a reduced rent from December 26, 1973 until November 4, 1974, the rate being reduced from 40 per cent to 35 per cent. No change was to be made in the Swiss House rental. It would remain as it was. The terms for an extension agreement with Swiss House were discussed and many points considered. It was understood that these would be taken up by defendant's representatives with superiors in St. Louis and an effort to accommodate the desires expressed at the meeting would be made.

On August 1, 1974 defendant's manager wrote a letter to plaintiff stating that "As provided in our Agreement [the

reference is obscure] we are hereby giving written notice of proposed changes in the upcoming contract with Restaurant Associates Industries, Inc."

On September 18, 1974 the defendant sent to plaintiff a draft copy of the proposed new operating contract for Swiss House and asked for legal study and comments and its return for finalization.

On November 7, 1974 the plaintiffs sent to defendant a revised draft of the proposed agreement covering Swiss House. The counter proposals contained therein were substantial and material. More importantly, the alterations were unacceptable to defendant.

It is true that Associates expected to obtain a new management contract and acted that way, but the fact is that it did not obtain one. Indeed, it made arrangements with a labor union in December 1974 operative into 1976. These arrangements were made known to defendant and certainly reflected an expectancy of the parties that they would reach a meeting of the minds and sign a new contract. However, plaintiff's expectancy cannot be equated with a contract. It should have realized that it had not signed with the defendant when it signed with the union.

Matters stood in this posture—at an impasse—until May 21, 1975 when defendant, referring to the agreement dated December 8, 1972, in a reference which is difficult to understand in the light of the background, wrote to plaintiff that the letter of August 1, 1974 had notified plaintiff of defendant's intent to terminate "the subject agreement as to the terms and conditions then in effect."

Further, that "As we have since been unable to reach agreement as to mutually acceptable terms upon which to continue our relationship, this letter is to notify you of the termination of your agency effective midnight, June 30, 1975."

In preparation for this act, the defendant had meanwhile been conducting talks secretly with the plaintiff's on site local manager, Sidney Sherman, with a view to having him take over the management of Swiss House as the agent of the defendant. These negotiations were not disclosed to plaintiff. However, Sherman was a mere at will employee under no contractual obligation to the plaintiff and, so far as was shown in this record, was free to negotiate a better employment for himself on the assumption which he could properly entertain that plaintiff was about to lose the agency. Whether the defendant employer's obligations to its agent, the plaintiff, were breached cannot be resolved on this application.

After defendant secured Sherman's agreement to manage Swiss House, on May 15, 1975 Sherman undertook to organize a corporate vehicle named Sherman Management Corporation, Inc., capitalized at $500 in which he and his wife were the sole stockholders. On May 20 Sherman signed an agency contract with the defendant. On May 21 the defendant gave notice to plaintiff of cancellation of the relationship, and on May 30 defendant signed the agency agreement with Sherman Management Corporation, Inc.

The plaintiff contends that it had an oral agreement for management of the facilities for a two-year term covering the period when no written arrangement was in effect. The credible evidence does not substantiate this contention. What appears to have happened is that the commercial impetus to keep going oblivious to the contractual void was what kept the parties together between September 26, 1973 and the present date—not a contract, either oral or written.

The defendant's letters of August 1, 1974 and May 21, 1975 confusingly speak of the "Agreement," and the "Agreement of December 26, 1972" as those which were being terminated—yet there was no factual vitality in the references. The practical construction of the defendant as to the existence of some arrangement that needed termina-

tion leads only to conjecture and speculation as to the application thereof.

■■ The fundamental basis of contract is a meeting of minds of the parties. An assent to contract must be manifested by overt acts. While assent need not be expressed in words or in writing, the assent must be unequivocally referable to the terms of the offer or counter offer. The law construes both acts and words as having the meaning which a reasonable person would put on them in view of the facts and circumstances. No credible evidence has been presented of such an assent to a management contract relating to Swiss House for any period beyond December 25, 1973.

■ Consideration of whether an injunction should issue this early begins with the proposition that injunctive relief is an extraordinary remedy. Injunctive relief in advance of the trial is available only to the plaintiff who cannot be adequately compensated by money damages. The function of a preliminary injunction is to preserve, as best as is possible, the status quo pending a trial on the complaint which will determine if a permanent injunction should issue.

■ The burden which the plaintiff must satisfy to be entitled to this extraordinary relief is clear likelihood of success on the law and the facts then available and possible irreparable injury, or sufficiently serious questions on the merits making them fair ground for litigation and a balance of the equities tipping decidedly in favor of preliminary relief.

■ In the exercise of the Court's discretion and on the facts and circumstances herein as credited by the Court, the plaintiff fails to satisfy these requirements. There is no clear likelihood of plaintiff's ultimate success. The injury does not appear to be irreparable and an adequate remedy at law for damages appears sufficient. It cannot be said with assurance that there are sufficiently serious questions, on the merits

making them fair ground for litigation, and the balance of the equities certainly does not on this record and the credible proofs tip decidedly in favor of preliminary relief.

The motion for a preliminary injunction must be and is accordingly denied in all respects.

The foregoing shall constitute the Court's findings and conclusions in accordance with Federal Rules of Civil Procedure, rule 52(a).

So ordered.