RESTAURANT ASSOCIATES INDUS-
TRIES, INC., Plaintiff,

v.

ANHEUSER–BUSCH, INC., Defendant,

and

Sidney Sherman and Sherman Manage-
ment Corp. as additional defendants be-
cause they are or may be needed for an
adjudication pursuant to FRCP 19.

No. 75 Civ. 3018(MP).

United States District Court,
S. D. New York.

Nov. 23, 1976.

Dornbush Mensch Mandelstam & Schwartz, New York City, for plaintiff; by Richard J. Schaeffer, New York City.

Willkie, Farr & Gallagher, New York City, for defendant; by Paula J. Mueller, Robert J. Kheel, New York City.

POLLACK, District Judge.

This diversity case was tried to the Court without a jury. Plaintiff, claiming breach of contract and unlawful enticement of a key employee, sought damages and injunctive and declaratory relief.

The plaintiff had for some years operated the food and beverage facilities of the Old Swiss House in Busch Gardens, Tampa, Florida, a unique tourist attraction owned by the corporate defendant. The corporate defendant terminated the relationship as of July 9, 1975 and took over the operation of those facilities, hiring the employee (Sidney Sherman) who had been plaintiff's general manager for operations at Busch Gardens to manage Old Swiss House on its behalf.

The background has been set out in the Court's opinion denying a preliminary in-

junction. *Restaurant Associates Industries, Inc. v. Anheuser-Busch, Inc.,* 397 F.Supp. 1213 (S.D.N.Y. 1975). Most of the significant facts were agreed to by the parties in the pretrial order herein. These will be deemed incorporated hereby. The basic disputes tried to the Court were whether there was an existing contract between the parties at the time the corporate defendant elected to take over and manage the operation itself, and whether Sherman was free to receive and accept the corporate defendant's offer of employment which was effective upon the termination of plaintiff's right to manage Old Swiss House.

For the reasons detailed hereafter, the plaintiff is not entitled to any relief herein.

### Applicable Law

In this diversity action, the law of the forum state, including its choice of law rules, must be applied. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York's conflicts rules provide that contracting parties may choose the state law by which their agreement is to be governed as long as the state whose law is chosen has a reasonable connection with the controversy. *A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 382, 165 N.Y.S.2d 475, 486, 144 N.E.2d 371 (1957).

The Management Agreement under which the parties operated provides that it shall be governed by the laws of Florida, the state in which the Agreement was performed. Consequently, Florida law is to be applied to plaintiff's breach of contract claim.

Florida law is also applicable to plaintiff's unlawful enticement claim since Florida is the jurisdiction with the most significant contacts with that issue. *See Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y. S.2d 743, 191 N.E.2d 279 (1963). Florida courts, however, have not addressed many of the legal issues raised in the present

lawsuit. The parties have cited cases from various jurisdictions as indicative of the decisions Florida courts would be likely to reach, and this Court has proceeded on that basis.

### The Breach of Contract Claim

Restaurant Associates Industries, Inc. (Associates, or plaintiff, hereafter) began operating the food and beverage facilities at Busch Gardens for Anheuser-Busch, Inc. (Busch, or defendant, hereafter) in late 1969. The parties subsequently entered into a formal Management Agreement for a term to end December 25, 1973. The Management Agreement contained a clause (Paragraph 4(b)) providing for automatic annual renewal unless either party gave written notice of termination at least 90 days before the expiration of the initial or some additional term.

The Management Agreement was the last written agreement entered into by the parties. Busch sent written notice of termination of this agreement on September 24, 1973 to Associates. However, Associates continued to manage Old Swiss House until the relationship was terminated as of July 9, 1975 pursuant to notice given May 27, 1975.

Resolution of plaintiff's breach of contract claim depends solely on whether the letter sent by Busch on September 24, 1973 terminated the Management Agreement at the end of its initial term.[1] The evidence establishes that the term contract was ended in 1973 and that the arrangement thereafter was only one of an agency at will.

The text of the 1973 Busch letter terminating the written contract stated:

> Please be advised that Anheuser-Busch, Incorporated, desires to renegotiate certain terms of the management agreement which is scheduled to terminate December 25, 1973. This notice is being sent in

---

1. Busch has not suggested that it gave any other notice that would have precluded automatic annual renewal of the contract through December 25, 1975. Associates has not disput-

ed that if the contract was not automatically renewed at the end of its initial term, then the subsequent relationship of the parties was at will and terminable upon reasonable notice.

compliance with the requirements of Paragraph 4(b) of the Management Agreement.

I have asked Mr. James R. Bickle [Busch's director of merchandising] to contact you shortly in an effort to conclude negotiations with representatives of your company as soon as possible.

The Busch letter gave Associates sufficiently clear and unequivocal notice that the Management Agreement would not be automatically renewed and would thus terminate at the end of the initial term. It explicitly stated that it was being sent as notice "in compliance with the requirements of Paragraph 4(b) of the Management Agreement," *i.e.*, the paragraph providing for automatic renewal unless notice of termination were given. The letter noted that the Agreement was scheduled to terminate on December 25, 1973, and that Busch wished to renegotiate its terms. Busch's expression of its desire to renegotiate does not alter the fact that the letter was sufficient to put Associates on notice that there would not be an automatic renewal.

The Busch vice president who wrote the letter testified that it was his intention in sending the missive to terminate the contract with Associates. Busch's director of merchandising testified that it was his understanding that after December 25, 1973 there was no contractual agreement in force and that Associates continued to operate Old Swiss House pursuant only to an "ongoing understanding." The parties engaged in extensive negotiations after December 25, 1973 aimed at achieving a new contract, in the course of which they apparently negotiated and implemented oral agreements controlling the on-going relationship. The Management Agreement had provided that amendments thereto could be accomplished only by a signed writing. The informal oral agreements reached in the negotiations after the termination were inconsistent with substantive provisions of the Management Agreement, a circum-

stance supporting the absence of a renewal of the term contract.

■ Associates contends that the Busch letter which it admittedly received within the usual time for mail delivery (three days) was nonetheless ineffective to terminate the contract between the parties because it was sent by regular mail, not by registered or certified mail as specified in the Management Agreement. Associates made no objection at the time to the form of the posting and the point lacks merit. An argument identical to that advanced by Associates was rejected in *Barbier v. Barry,* 345 S.W.2d 557 (Tex.Ct.Civ.App. 1961), which held that if such a letter was in fact received the failure to send it by registered or certified mail does not destroy its effectiveness as notice.[2]

■ Associates also asserts that the September 24, 1973 letter was ineffective because it was addressed to Restaurant Associates, Inc., instead of Restaurant Associates Industries, Inc., the name used in the Management Agreement. However, the letter was addressed to the corporate officer of Associates specified in the Management Agreement and was mailed to the proper street address and it was duly received by the party for whom it was intended. This minor misstatement of Associates' corporate name did not destroy the letter's effectiveness as notice.

■ Associates claims further that the September 24, 1973 letter was ineffective to terminate the Management Agreement because although it was mailed 91 days before the December 25, 1973 expiration date, it was not received until 88 days before that date. The Agreement, however, provided not that notice should be received but that notice should be given not less than 90 days prior to the expiration date. There is no indication that the parties intended time of receipt to be of the essence. To the contrary, the Management Agreement provided that letters sent via registered or certified mail should be deemed effective as of

---

**2.** *Phillips v. Kastens,* 188 N.Y.S. 121 (App.T. 1921), relied on by Associates, is distinguishable. In that case the intended recipient of a letter purporting to be notice of termination of a contract, sent via ordinary mail, denied ever having received the letter.

the date of the mailing thereof. It would be unrealistic to view the 1973 letter to have been too late when no such thought crossed the mind of Associates until this litigation and no prejudice resulted from the alleged delay. *See, Music, Inc. v. Henry B. Klein Co.*, 213 Pa.Super. 182, 245 A.2d 650 (1968).[3]

Accordingly, the Court holds that the Management Agreement was terminated as of December 25, 1973. After that date the relationship between the parties was solely at will, terminable upon reasonable notice. Associates makes no claim that the notice of termination given May 27, 1975 was unreasonable, so Busch is not liable to Associates for terminating its right to manage Old Swiss House as of July 9, 1975.

### The Unlawful Enticement Claim

Associates claims that Busch, by negotiating with and offering employment to its employee, Sidney Sherman, induced him to breach a fiduciary duty to Associates. An alternative formulation used by Associates is that Busch tortiously interfered with the business relation between Sherman and Associates, and thereby breached its own fiduciary obligation to Associates. Associates has failed to prove that Busch's conduct was actionable under any theory.

Sherman began working for Associates in 1965 and was made general manager for operations at Busch Gardens on January 1, 1974 at a salary of $26,000 a year. He retained that position until July 9, 1975 when Associates ceased operating Old Swiss House. Sherman's duties while in the employ of Associates included overall responsibility for and supervision of all activities engaged in by Associates at Busch Gardens.

Sherman's relationship with Associates was always as an employee at will. He never was a corporate officer or director of Associates.

In January 1975, when negotiations for a new contract with Associates seemed to be foundering, Busch commenced discussions with Sherman concerning his leaving Associates to manage Old Swiss House for Busch. Busch's director of merchandising informed Sherman that Associates had not yet signed a contract proposed by Busch and that if the parties could not come to an agreement Busch would have to make arrangements for a successor. Sherman expressed hope that Busch could come to an agreement with Associates and continue to operate Old Swiss House with Associates as the agent and Sherman as their employee, but indicated that if this did not eventuate he would be interested in being considered as a successor to Associates.

In May 1975 Sherman was told that Busch had decided to terminate its relationship with Associates, that they would like him to assume management of Old Swiss House, and that if he did not take the job it surely would not go to Associates. Sherman had told both Associates and Busch that he did not wish to leave Tampa and intended to continue living in that area.

Sherman accepted Busch's offer of employment and formed a personal corporation, Sherman Management Corp., which was employed to manage Old Swiss House from July 9, 1975 on. Associates was not advised of the negotiations between Busch and Sherman until after the employment contract was entered into by them.

■ It is true that where a third party deals with an agent knowing that the agent is acting in violation of his fiduciary duty to his principal, the third party is jointly liable with the agent for damages occasioned to the principal. *Martin Co. v. Commercial Chemists, Inc.*, 213 So.2d 477 (Fla.Dist.Ct. App.1968). However, Associates has not shown that its agent Sherman violated any fiduciary duty owing to it.

■ That Sherman negotiated with Busch for an employment to replace Associates at Old Swiss House was not a breach of

---

**3.** *But see State ex rel. Hall v. Camper,* 347 A.2d 137 (Del.Super.Ct.1975). *Camper* rejected the *Music* holding, calling it "not the majority position." However, all of the cases relied on in the *Camper* opinion involved statutory, rather than contractual, notice provisions; and none contained a clause indicating that time was not considered of the essence.

any fiduciary obligation he owed to Associates. An agent may, before termination of his employment, make arrangements to later compete with the principal as to matters for which he had been employed. Restatement (Second) of Agency § 393, comment (e) (1958), followed in, *e. g., United Aircraft Corp. v. Boreen,* 413 F.2d 694 (3d Cir. 1969). *See also Connelly v. Special Road & Bridge Dist. No. 5,* 99 Fla. 456, 126 So. 794 (1930). Nor was Sherman's failure to disclose his negotiations with Busch a breach of a fiduciary duty. *National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1 (Mo.1966); *Cudahy Co. v. American Laboratories, Inc.,* 313 F.Supp. 1339 (D.Neb.1970).

Associates argues that Sherman's conduct was in violation of a fiduciary obligation because he aided Busch in its plan to place itself in a favorable position for the termination of Associates' agency for the purpose of destroying Associates' business. The evidence, however, does not establish any improper motives on the part of Sherman or Busch. *Compare Town & Country House & Home Service, Inc. v. Newbery,* 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958) *with Duane Jones Co. v. Burke,* 306 N.Y. 172, 117 N.E.2d 237 (1954), *and A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 482, 144 N.E.2d 371 (1957). There was no purpose on the part either of Sherman or Busch to injure or destroy the business or agency of Associates.

This is not a case in which an agent procured for himself a contract that might just as easily have been procured for his employer. Sherman agreed to work for Busch only after learning that Busch had resolved to end its relationship with Associates.

In *Anker v. Dobbs,* 57 So.2d 432 (Fla. 1952), the Florida Supreme Court refused to find liability under similar circumstances.

The Florida court affirmed the dismissal of a complaint alleging breach of fiduciary duty by a franchisee's employees who had contracted with the franchisor to replace their employer as franchisee. Noting that the defendants had made no effort to secure the contract until learning that their employer's franchise was in danger of being taken from him, the Court held that the employer had failed to carry the burden of proving that the defendants had induced the cancellation of his franchise. Associates has similarly failed to prove that either Busch or Sherman induced the cancellation of Associates' agency in this case.

 Associates does not improve its position by characterizing its cause of action as one for interference with its business relation with Sherman. The basic rule is that a competitor [4] is privileged to induce the termination of a contract between an employer and his employee where the contract is terminable at will. Prosser, *Law of Torts* § 129 at 946 (4th ed. 1971); Restatement (Second) of Torts § 768, Note to Institute (2) (Tent. Draft No. 14, 1969), followed in, *e. g., Anchor Alloys, Inc. v. Non-Ferrous Processing Corp.,* 39 A.D.2d 504, 336 N.Y. S.2d 944 (1972) (inducement of employee at will to move to a competitor will not give rise to liability unless the purpose was solely to produce damage or the means employed were unfair); *Republic Systems & Programming, Inc. v. Computer Assistance, Inc.,* 322 F.Supp. 619 (D.Conn.1970), *aff'd per curiam,* 440 F.2d 996 (2d Cir. 1971). *See also Frank Coulson, Inc.-Buick v. General Motors Corp.,* 488 F.2d 202, 206 (5th Cir. 1974); *International Expositions, Inc. v. Miami Beach,* 274 So.2d 29 (Fla.Dist.Ct.App. 1973).

The Prosser-Restatement privilege reflects the policies enunciated in two Learned Hand opinions:

4. Busch may be deemed a competitor of Associates in the sense that both parties were involved in the operation of a restaurant and both parties needed employees skilled in that business. *See National Oil Co. v. Phillips Petroleum Co.,* 265 F.Supp. 320, 328–30 (W.D. Wis.1966) (oil company and its jobber treated as competitors); Restatement (Second) of

Torts § 768, comment (c) (Tent. Draft No. 14, 1969).

Moreover, the privilege to induce a third person, bound only by a contract terminable at will, not to continue a business relation with another is not limited to competitors. *See* Restatement (Second) of Torts §§ 766, comment (a), and 767 (Tent. Draft No. 14, 1969).

So far as we have found, it has never been thought actionable to take away another's employee, when the defendant wants to use him in his own business, however much the plaintiff may suffer. It is difficult to see how servants could get the full value of their services on any other terms; time creates no prescriptive right in other men's labor. If an employer expects so much, he must secure it by contract. *Harley & Lund Corp. v. Murray Rubber Co.,* 31 F.2d 932, 934 (2d Cir.), *cert. denied,* 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929). Nobody has ever thought, so far as we can find, that in the absence of some monopolistic purpose every one has not the right to offer better terms to another's employe[e], so long as the latter is free to leave. The result of the contrary would be intolerable, both to such employers as could use the employe[e] more effectively and to such employe[e]s as might receive added pay. It would put an end to any kind of competition. *Triangle Film Corp. v. Artcraft Pictures Corp.,* 250 F. 981, 982 (2d Cir. 1918).

The privilege may be defeated if the actor employs improper means or evinces improper motivation. However, in the present case Busch's conduct was unmarked by fraud or coercion and there is no evidence of a purpose to cripple Associates.

Associates seeks to avoid application of the Prosser-Restatement rule by claiming that Busch stood in a "relation of confidence" to it. The privilege to induce an employee to discontinue a business relation has been held unavailable where a relation of confidence existed between the actor and the former employer. *A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957).

Associates, however, has not proved the requisite relation of confidence between itself and Busch. Joseph Kayata, Associates' vice president and chief accounting officer, testified that on an overall basis Associates' business was not dominated by Busch. The evidence does not establish Associates' economic dependency on Busch. The mere fact that Associates had a contractual relationship with and performed services for Busch does not render the Prosser-Restatement privilege inapplicable. *See National Oil Co. v. Phillips Petroleum Co.,* 265 F.Supp. 320, 328–30 (W.D.Wis.1966) (privilege applied where oil company solicited key employees of its jobber).

Moreover, Associates has not proved that, as was alleged in *Rampell,* Busch's real purpose was to appropriate the staff and goodwill of Associates. Consequently, Busch is not liable to Associates for its dealings with Sherman. Neither Sherman nor Sherman Management Corp. was served with process in this case and, at all events, there is no basis for imposing any liability on either of them and the plaintiff is not entitled to any relief as to them.

Accordingly, judgment is directed to be entered in favor of the defendants and against plaintiff, dismissing the entire amended complaint, with costs.

The foregoing shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

SO ORDERED.