963 F.2d 367
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
CEMCOM CORPORATION, Plaintiff-Appellant,
v.
OCCIDENTAL CHEMICAL CORPORATION, Defendant-Appellee.
 No. 90-1813.
 United States Court of Appeals,
Fourth Circuit.
 Argued: December 5, 1991
Decided: May 26, 1992
 
 Argued: Allan Pike Hillman, FRANK, BERNSTEIN, CONAWAY & GOLDMAN, Baltimore, Maryland, for Appellant.
 William Salvatore D'Amico, CHADBOURNE & PARKE, Washington, D.C., for Appellee.
 On Brief: Paul M. Vettori, FRANK, BERNSTEIN, CONAWAY & GOLDMAN, Baltimore, Maryland, for Appellant.
 Kenneth R. Pierce, Robert A. Schwinger, CHADBOURNE & PARKE, Washington, D.C., for Appellee.
 Before WIDENER and LUTTIG, Circuit Judges, and SHEDD, United States District Judge for the District of South Carolina, sitting by designation.
 LUTTIG, Circuit Judge:
 
 
 1
 Appellant Cemcom Corporation ("Cemcom") filed this action against appellee Occidental Chemical Corporation ("Oxychem"), alleging that Oxychem had attempted to terminate its license agreement with Cemcom without satisfying its contractual obligation to make a "determination to abandon" the technology that was the subject of the parties' agreement. The district court held that Oxychem had in fact satisfied that requirement, and entered judgment for Oxychem. We conclude that the district court misconstrued the parties' contract and that Oxychem did not satisfy its obligation to make a determination to abandon the technology. We therefore reverse.
 
 I.
 
 2
 Cemcom entered into a written license agreement with Oxychem on March 1, 1986. Pursuant to the agreement, Cemcom granted Oxychem a fifty-year license to make, use, and sell certain cementitiousbased composite products, see J.A. at 108-11, referred to in the agreement as the "KNOW-HOW," see id. at 139. Cemcom also granted Oxychem the right to appoint the manager of Cemcom's business. Id. at 118-19. In exchange for these rights, Oxychem was required to make certain royalty payments to Cemcom, id. at 112-14, and to finance Cemcom's operating deficiencies, id. at 115-18.
 
 
 3
 Section 11.3 of the agreement gave Oxychem the right to terminate the contract. The section provided as follows:
 
 
 4
 At any time after September 1, 1987, OXYCHEM may elect to terminate this Agreement upon six (6) months written notice, and during the six (6) month period, OXYCHEM shall continue with its obligations pursuant to Section 6. This notice shall be ineffective unless OXYCHEM shall have made a good faith determination to abandon the KNOWHOW. In the event of the termination of this Agreement by reason of OXYCHEM's default or a termination. [sic] pursuant to Section 11.3, OXYCHEM shall return to CEMCOM any KNOW-HOW, including without limitation any data, plans, specifications, manufacturing and operating methods and processes, flowsheets, designs and drawings which OXYCHEM may possess or control and OXYCHEM shall not directly or indirectly engage in any business based on cementitious products.
 
 
 5
 Id. at 123 (emphasis added). Oxychem was thus required to give six months' written notice and to make "a good faith determination to abandon" the KNOW-HOW technology in order to terminate its agreement with Cemcom.
 
 
 6
 On November 27, 1989, Oxychem sent Cemcom a letter that read, in relevant part, as follows:
 
 
 7
 First, this letter is OxyChem's official notification that we intend to terminate the Cemcom License six months from the date of this letter if we are unable to restructure our relationship as described in this letter. Secondly, if we are able to restructure our relationship as follows, OxyChem's desire is to remain with the Cemcom technology.
 
 
 8
 Id. at 144. The letter went on to outline Oxychem's proposed reorganization, according to which Cemcom and Oxychem would form a new entity that would be the licensee of the technology. Id. at 144-48.
 
 
 9
 Between December 1989 and April 1990 Oxychem and Cemcom discussed various restructuring plans, but were ultimately unable to agree on a plan. In May 1990, Oxychem notified customers and suppliers that its agreement with Cemcom would be terminated as of June 30, 1990.
 
 
 10
 On June 15, 1990, Cemcom filed a complaint in the United States District Court for the District of Maryland and moved for a preliminary injunction prohibiting Oxychem from terminating the agreement. The basis of the complaint was that Oxychem's November 27, 1989, letter was ineffective as a notice of termination because Oxychem had failed to make a determination to "abandon" the technology, as required by the license agreement. Cemcom contended that Oxychem's expressed interest in restructuring its relationship confirmed that Oxychem had not made a determination to abandon the KNOWHOW technology.
 
 
 11
 The district court consolidated Cemcom's preliminary injunction hearing with the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. After Cemcom had presented its case in chief, the district court granted Oxychem's Rule 41(b) motion to dismiss Cemcom's suit.[1] It held that Oxychem had made a determination to abandon the KNOW-HOW technology and that Oxychem's continued loss of money provided a "good faith basis" for its determination. Id. at 241-43. The court rejected Cemcom's contention that Oxychem's expressed interest in restructuring was inconsistent with a determination to abandon. The court thereafter entered judgment on the merits, id. at 245, 326, and denied Cemcom's motion for a new trial, id. at 335-37. This appeal followed.
 
 II.
 
 12
 The single issue presented by Cemcom's appeal is whether the parties meant by the term "abandon" that Oxychem would have no connection whatever with the KNOW-HOW technology, as Cemcom contends,[2] or merely that Oxychem would no longer be the licensee of the technology, as Oxychem contends. If the parties intended the former meaning, then Oxychem's expressed desire to restructure its relationship with Cemcom would be inconsistent with a "determination to abandon" the technology, and Oxychem would have failed to meet its contractual obligation. If the parties intended the latter meaning, then Oxychem's November 27, 1989, letter would evidence a determination to abandon the technology sufficient to satisfy its section 11.3 obligation, because Oxychem would no longer be the licensee of the KNOW-HOW following a restructuring of the relationship.
 
 
 13
 Oxychem's interpretation of section 11.3's "determination to abandon" requirement is not implausible. Cemcom's interpretation, however, clearly represents the better reading of the actual contract language. See Black's Law Dictionary 2 (6th ed. 1990) (defining "abandon" as "[t]o give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in"). Moreover, Oxychem's November 27, 1989, letter to Cemcom confirms that Oxychem in fact shared Cemcom's understanding of the term "abandon" at the time of the contract's execution. We therefore interpret the parties' agreement to give effect to this shared understanding of the term.
 
 
 14
 The purpose of Oxychem's letter was to provide Cemcom with the required section 11.3 notice of termination and to apprise Cemcom that Oxychem had made the requisite determination under that section to abandon the KNOW-HOW technology. The text of that letter naturally "mirrors the language of [section] 11.3," as the district court noted, J.A. at 238, and the terms of the letter draw their meaning from the terms of the agreement itself. In that letter, Oxychem stated that if its relationship with Cemcom could be restructured, its desire was "to remain with the Cemcom technology." It is evident that Oxychem chose the phrase "remain with" to convey the opposite meaning from the contract term "abandon"; it intended its desire to "remain with" the technology in the event of a restructuring to be understood in contrast to its intention to abandon the technology if its relationship with Cemcom was not restructured. It is also clear that Oxychem did not understand "remain with" to mean continuing as the licensee of the technology, because Oxychem would no longer be the licensee of the KNOW-HOW under its proposed restructured relationship with Cemcom. It follows from this understanding of the phrase "remain with" that Oxychem did not believe that the term "abandon" in the agreement meant merely the termination of its licensee status. Rather, it apparently believed, as did Cemcom, that the term meant the severance of all connection, and the discontinuance of any association, with the KNOW-HOW technology.[3] We hold, therefore, that section 11.3 of the agreement between Cemcom and Oxychem required a good faith determination to sever all connection and discontinue any association with the KNOW-HOW technology. Because Oxychem's proposal to restructure its relationship with Cemcom was inconsistent with a determination to abandon the KNOW-HOW technology, as so defined, we reverse the judgment of the district court and remand for proceedings not inconsistent with this opinion.
 
 REVERSED AND REMANDED
 
 15
 SHEDD, District Judge, concurring in part and dissenting in part:
 
 
 16
 I concur in the result reached by the majority because the district court misconstrued Section 11.3 of the Agreement. However, I disagree with the majority's finding, based upon this limited record, that Oxychem did not satisfy its obligation to make a good faith determination to abandon the technology, and I therefore dissent. In my opinion, a finding on this question should be made by the district court, after a full evidentiary hearing.
 
 
 17
 I agree with the majority's analysis that the parties meant by the use of the term "abandon" in Section 11.3 of the Agreement, that Oxychem would have no connection whatever with the KNOW-HOW technology. I further agree that the November 27th letter alone was insufficient to establish that Oxychem had made a good faith determination to abandon the KNOW-HOW and on this ground, I concur in the reversal of the district court.
 
 
 18
 The majority's opinion, however, forecloses the defendant from establishing, through evidence other than the November 27th letter, that a determination to "abandon," as that term is interpreted by this Court, was made prior to November 27, 1991. I believe the case should be remanded with instructions to the district court to make a factual finding on the issue of whether, prior to sending the November 27th letter, Oxychem made a good faith determination to abandon the KNOW-HOW, applying the proper definition of "abandon."
 
 
 19
 The record indicates that Oxychem may be able to establish that, prior to November 27, it made a good faith determination to sever all connection and discontinue any association with the KNOW-HOW. The decision was communicated to Mr. Townsend, of Cemcom, who then initiated negotiations with Oxychem to restructure the agreement on terms more favorable to Oxychem, in hopes of salvaging some financial support from Oxychem.[1]
 
 
 20
 Under this factual scenario, the district court may find that Oxychem made a good faith determination to abandon the KNOW-HOW. A determinative issue, which is not addressed in the majority's opinion, is whether the "good faith determination to abandon" provision precludes Oxychem from discussing proposals involving some arrangement short of total abandonment during the six month notice period.
 
 
 21
 The district court specifically ruled that "I do not find that as a matter of fact or law that the present wording of 11.3 was intended to preclude renegotiation." J.A. at 241. It is my opinion that the district court was correct on this issue. As a general legal principle of contracts, the fact that a notice of termination is accompanied by an offer to renegotiate, does not render it ineffective. See Restaurant Associates, Inc. v. Anheuser-Busch, Inc., 422 F. Supp. 1105 (S.D.N.Y. 1976), affirmed in part and reversed in part, on other grounds, 559 F.2d 1205 (2d Cir. 1977).
 
 
 22
 However, Cemcom contends that Section 11.3 was intended to prohibit subsequent negotiations. The language of Section 11.3 does not contain any wording from which a prohibition on negotiations can be found. Under Cemcom's interpretation, if at any time during the six month notice period, Oxychem entertains the possibility of a new arrangement, then Oxychem must send another written notice of termination and wait six additional months. The ability to consider alternative courses of action, once a decision has been made to terminate an existing relationship, is so essential to business transactions that clear and specific contractual language should be required to prohibit this behavior.
 
 
 23
 In my opinion, since the Agreement does not contain an explicit prohibition on renegotiation, Oxychem did not have to refrain from considering restructured agreements during the notice period. Under the majority's view, the offer to restructure the relationship, contained in the November 27th letter, precludes a finding that Oxychem made a good faith determination to abandon the KNOW-HOW. To reach this conclusion, the majority must necessarily look beyond the plain meaning of the language used in the contract and rely on the extrinsic testimony of Mr. Townsend, cited in footnote two of the majority's opinion.
 
 
 24
 Section 11.3 provides that Oxychem may terminate the license agreement upon six months written notice. Section 11.3 further provides that a notice of termination "shall be ineffective unless Oxychem shall have made a good faith determination to abandon the KNOW-HOW." (emphasis added). Literally, this provision only requires that Oxychem make a determination to abandon the KNOWHOW prior to sending a notice of termination. The requirement to make a good faith determination to abandon the KNOW-HOW is a condition precedent which must be satisfied before written notice of termination will be effective. If Oxychem made a good faith determination to abandon prior to sending the notice of termination, then the notice is effective. If not, the notice will be ineffective. Section 11.3 does not contain any explicit restrictions on Oxychem's intentions with regard to the KNOW-HOW, during the six month notice period.
 
 
 25
 The majority's reasoning extends the obligation of the condition precedent through the six month period following written notice of termination. In reaching its decision, the majority adopts Cemcom's interpretation of this provision, which is based upon the parol evidence of Dennis Townsend, president of Cemcom. Supra. at. 5, f.n. 2. However, at this stage, Oxychem has not had an opportunity to present its parol evidence on this issue. Therefore, at a minimum, the district court should make a factual determination, based on parol evidence, regarding the effect Section 11.3 was intended to have on Oxychem's ability to negotiate during the six month notice period.[2]
 
 
 26
 For these reasons, I would reverse the district court and remand the case for a factual finding on the question of whether Oxychem made a good faith determination to abandon the KNOW-HOW, prior to sending the November 27th letter.
 
 
 27
 September 12, 1989. It was at this meeting, in fact, that you requested that Oxychem consider other alternatives to remain associated with the Cemcom business by converting its assets into an equity position in Cemcom, as opposed to our expressed desired to exit the business.
 
 
 
 [1]
 At the time of trial, Rule 41(b) provided, in relevant part, as follows: "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant ... may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." Fed. R. Civ. P. 41(b), 480 U.S. 992 (1987). This portion of Rule 41(b) is no longer in force
 
 
 [2]
 Cemcom relies not only on the language of the contract but also on extrinsic evidence to support its interpretation of section 11.3. Dennis Townsend, the president of Cemcom, who was present when the terms of the agreement were negotiated, and who was the only witness at trial, testified that the "determination to abandon" language had been inserted into section 11.3 so that Cemcom would not be presented with the choice of renegotiating on Oxychem's terms or accepting a termination of the agreement. J.A. at 204-09. According to Townsend, but for the language, Oxychem would have had "a tremendous cannon sitting at my head at the time [it] wanted to simply renegotiate the license agreement." Id . at 204
 
 
 [3]
 Although Judge Shedd agrees that mere discontinuation of Oxychem's status as licensee does not constitute abandonment, he would have the district court determine on remand whether Oxychem had ever made a determination to "abandon" (as we herein define that term)-i.e., whether it had ever made a determination to have nothing whatever to do with the technology. Judge Shedd apparently would hold that if Oxychem had at some point decided to abandon the technology, but subsequently changed its mind, it would have satisfied its contractual obligation to make a "determination to abandon" the technology. We doubt the parties intended such a result
 While Judge Shedd may agree with our definition of"abandon," see post at 7, it appears that he disagrees with our definition of "determination." Judge Shedd believes that a "determination" to abandon the technology can be a tentative, transient, or revocable decision. We believe that in this context a "determination" to abandon is necessarily a decision that is conclusive, continuous, and permanent. See Webster's Third New International Dictionary 616 (1986) (defining "determination" as "the act of deciding definitely and firmly esp. regarding a course of action"). Thus, in our view, even if Oxychem at some point tentatively decided to dissociate itself from the technology entirely, we would not reach a different conclusion than we reach today, because the fact would remain that Oxychem thereafter decided that it might not abandon the technology (as evidenced by its letter of November 27, 1989). This equivocation is inconsistent with a "determination" to abandon, as we understand that term.
 
 
 [1]
 I am specifically referring to a letter written to Mr. Townsend from Oxychem dated May 1, 1990, which states:
 I had made a good faith determination to terminate the license agreement and abandon the technology well prior to my letter to you of November 27. In fact, our determination had been communicated to you by Mr. Luss and Mr. Koblin at several meetings with you prior to November 27, including a meeting in your offices on
 (emphasis added), J.A. at 290.
 
 
 [2]
 Furthermore, even if the parties intended to preclude negotiations during the notice period, the facts may support a finding that Cemcom waived this provision, or is estopped from asserting this provision, by initiating negotiations after learning of Oxychem's desire to "exit the business." The majority's analysis does not appear to prohibit Oxychem from pursuing a defense of waiver or estoppel, on remand. This issue was not raised on appeal, and I note it only as an example for the need for a full evidentiary hearing on remand